UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re the Application of:  Manuel Jose Lozano

Manuel Jose Lozano,

                              Petitioner,

         -v-

Diana Lucia Montoya Alvarez,

                              Respondent.

Case No. 10-CV-8485 (KMK)

OPINION AND ORDER

Appearances:

Sharon M. Mills, Esq.
Amos W. Barclay, Esq.
John R. Hein, Esq.
Shawn P. Regan, Esq.
Hunton & Williams, LLP
New York, New York
*Counsel for Petitioner*

Rachel G. Skaistis, Esq.
Lauren A. Moskowitz, Esq.
Etienne Barg-Townsend, Esq.
Carrie R. Bierman, Esq.
Cravath, Swaine & Moore, LLP
New York, New York
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

I.  Background

     This case involves a dispute between two parents, Manuel Jose Lozano ("Petitioner") and

Diana Lucia Montoya Alvarez ("Respondent"), regarding their five-year-old child.[1]  On

_____

     [1] The subject child is referred to as "the child" to protect her identity.  In addition, pursuant to a confidentiality order entered into by the Parties with the consent of the Court, information that could be used to identify the identity or location of the child, as well as

November 10, 2010, Petitioner filed in this Court a Petition for Return of Child to Petitioner (the

"Petition") pursuant to the Hague Convention on the Civil Aspects of International Child

Abduction, art. 2, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed.

Reg. 10,494 (Mar. 26, 1986) ("Hague Convention" or "Convention") and the International Child

Abduction Remedies Act, 42 U.S.C. §§ 11601-11611 (2005) ("ICARA"), requesting that the

Court issue an order requiring that his child be returned to London, United Kingdom, to have a

British court make a custody determination.  Accompanying the Petition was an Emergency

Petition for Warrant in Lieu of Writ of Habeas Corpus ("Emergency Petition").  The Emergency

Petition sought an order from the Court directing that the child be removed from Respondent and

delivered into the temporary protective custody of Social Services while the matter was pending.

In the alternative, Petitioner requested that the Court issue an order to show cause:  (1)

prohibiting the removal of the child from the Court's jurisdiction; (2) requiring Respondent to

post a bond; and (3) ordering Respondent to appear before the Court with all passports and travel

documents for Respondent and the child.  In support of the Petition, Petitioner submitted several

exhibits.

On November 12, 2010, the Court held an ex parte telephonic hearing with counsel for

Petitioner.  Following this hearing, the Court issued an order:  (1) ordering Respondent to appear

before the Court for a hearing on November 16, 2010; and (2) directing the United States

Marshal for the Southern District of New York ("Marshal") to (i) serve Respondent with a copy

of the Court's Order, the Petition, the Emergency Petition, and all attachments, and (ii) seize all

passports and travel documents for Respondent and the child.  (Dkt. No. 11.)  On November 15,

_____

privileged medical or mental health information, has been withheld.

2010, the Marshal served Respondent and retrieved the requested passports.  On November 16, 2010, Respondent and counsel for Petitioner appeared before the Court.  After the hearing, the Court issued an order stating that Respondent would not be required to post a bond and prohibiting Petitioner, or anyone acting on behalf of Petitioner except for his counsel, from contacting Respondent or the child.  (Dkt. No. 5.)

On November 23, 2010, counsel for Petitioner and newly obtained counsel for Respondent appeared before the Court at a telephonic conference.[2]  Although the Parties and the Court were cognizant of the need to adjudicate Hague Convention matters expeditiously, the Parties agreed to discuss a proposed schedule that would allow both sides an adequate opportunity to conduct discovery, obtain experts, and prepare for a hearing on the merits (the "Evidentiary Hearing").  On December 6, 2010, the Court agreed to the proposed schedule submitted by the Parties.  (Dkt. No. 16.)  The Parties submitted in limine motions and responses on January 28 and 31, and February 1 and 2, 2011, regarding certain testimony and evidentiary issues.  Specifically, each Party sought to exclude the other Party's expert report.  In addition, counsel for Respondent expressed concern over revealing the identity of one proposed witness, a therapist who has treated Respondent and the child in New York.  The Court held a telephonic conference on January 31, 2011, to discuss these issues.  At the conference, the Parties agreed that the therapist's name would not be disclosed and that she would be referred to throughout the proceedings as "the therapist."  The Court informed the Parties that it would rule on the motions

---

[2] Counsel for both Petitioner and Respondent have represented their clients on a pro bono basis.  The Court noted on the record and repeats here the excellence of their work in this case, and expresses its gratitude for their exemplary efforts.

in limine at the Evidentiary Hearing.[3]

The Court held the Evidentiary Hearing on February 2 and 3, 2011.  At the hearing, the Court heard testimony from:  (1) Petitioner; (2) Respondent; (3) Dr. B.J. Cling, an expert retained by Respondent for purposes of this proceeding ("Dr. Cling"); (4) a therapist who has treated Respondent and the child in New York (the "therapist"); and (5) Dr. Michael Fraser, an expert retained by Petitioner for purposes of this proceeding ("Dr. Fraser").  Petitioner testified and observed the hearing via videoconference in the London office of his counsel.  At the hearing, both Parties also submitted exhibits.  On February 18, 2011, both Parties submitted Post-Trial Memorandum of Law.  (Dkt. Nos. 32-33.)  The Court held oral argument on April 28, 2011 (the "Oral Argument") and, at its conclusion, the Court informed the Parties that it would be denying the Petition.  On April 29, 2011, the Court issued an Order dismissing the Petition and entering judgement for Respondent.  (Dkt. No. 39.)  At the Oral Argument, the Court recited the full procedural history of this case and issued its Findings of Fact and Conclusions of Law on the record.  This written opinion further sets forth the Court's Findings of Fact and Conclusions of Law.

## II.  Findings of Fact

The Parties present vastly different accounts of their relationship and many of the events that transpired between them.  As described below, the Court is unable to conclude that one party

---

[3] At the hearing, the Court concluded that both experts were qualified and that the proffered expert testimony and reports were admissible and did not run afoul of either the requirements of the Federal Rules of Evidence or *Daubert*.  The Court informed the Parties that it believed the objections went to the weight of the evidence, not its admissibility and, accordingly, the Court would keep the objections in mind when evaluating the evidence.  (Tr. 157-58.)

 "Tr." cites refer to the transcript of the February 2-3, 2011 Evidentiary Hearing.

is entirely credible and truthful and the other completely incredible and untruthful.  Instead, in many instances, the actual picture is somewhat murky.

A.  The Parties' Relationship

Petitioner and Respondent, who are both originally from Colombia, met and began dating in early 2004 in London.  (Ct. Ex. 1 ¶ A1.)[4]  Petitioner moved into Respondent's flat about two or three months after they began dating.  (Tr. 10.)  At the time they met, Respondent was not working and received government benefits; Petitioner worked in maintenance for a tax office and also had a nighttime cleaning job.  (*Id.* at 11-12.)  The Parties never married.  After the Parties moved in together, Petitioner mainly financially supported the household, while Respondent was responsible for cooking, cleaning, and taking care of their child after her birth.  (*Id.* at 55-56, 121.)  Respondent received incapacity benefits because she suffered from depression.  Respondent testified that when she arrived in London, she became very depressed because she missed her family and was unable to obtain a professional job like she had in Colombia; after she resigned from the job that she did have, she was very frustrated and became more depressed, and her doctor prescribed her Prozac.  (*Id.* at 99, 172.)  Respondent took Prozac for several years, but stopped when she first became pregnant with Petitioner's child; however, she started taking it again in 2008 before she left Petitioner.  (*Id.* at 171-72.)  Respondent received incapacity benefits from approximately 2003 until early 2006, when she did not renew the application because she "was fine" and felt she did not need to renew.  (*Id.* at 173-74.)

The Parties' description of their relationship is dissimilar.  Petitioner claims that although they had normal couple problems, generally they were "very happy together" and had a good

_____

[4] Court Exhibit 1 is a document labeled "Stipulations or Agreed Statements of Fact and Law," which the Parties jointly submitted to the Court at the Evidentiary Hearing.

relationship. (*Id.* at 13-14, 52, 58.) Although Respondent agrees that they were very happy at the beginning and describes Petitioner as charming, kind, fun, and spontaneous when she initially met him, she testified that after a month of living together, he began to treat her badly, insult her on a regular basis, and be generally very controlling. (*Id.* at 101-04.) Respondent describes a pattern of physical and emotional abuse. She testified that Petitioner tried to kick her in the stomach when she was pregnant, pulled her out of bed one night when she received a wrong number phone call and called her a prostitute, and raped her four times. (*Id.* at 109, 114-17.)[5] In addition, Respondent maintains that Petitioner repeatedly told her that she was stupid and useless and that her friends and family hated her, often told her to kill herself, and threatened to take the child away from her. (*Id.* at 110-11, 174.) Petitioner denies ever hitting or raping Respondent, forbidding her from speaking to her family or friends, or pushing her while she was pregnant, and testified that he never insulted, threatened, or raised his voice to Respondent. (*Id.* at 16-17, 59, 62-63, 72.) Respondent also testified that Petitioner drank heavily and watched pornography. (*Id.* at 104-05.) In contrast, Petitioner testified that he did not watch pornography (*id.* at 62), and denied that he drank a lot or had ever been so drunk that he did not know what he was doing, although he admitted that he sometimes has drunk about three beers in an evening, (*id.* at 51, 75-76).

In 2006, the Parties obtained a loan, in Respondent's name, to buy a flat in Colombia, but

---

[5] Respondent described one of the rapes at the hearing. According to Respondent, on a night when she had told Petitioner that she did not want to have sexual relations, she awoke to find that her clothes had been removed and Petitioner penetrating her; afterwards, she told Petitioner that he had raped her, and he apologized. (Tr. 114-15.) Petitioner denies that any such conversation took place, and maintains that he never raped Respondent nor attempted to have sex with her while she was asleep. (*Id.* at 64-65.) According to Respondent, the child was also in the room two of the times that Petitioner raped her (*id.* at 116-17), although Petitioner testified that they never had intercourse with the child in the room, (*id.* at 66).

the money was lost when it was transferred to Colombia.  (*Id.* at 14-15.)  This led to a court case which was not resolved until November 2008.  (*Id.* at 15-16.)  According to Petitioner, the Parties' relationship started to have problems during this time.  (*Id.* at 14-16.)  Petitioner also testified that during this time he asked Respondent to find a job to help address their financial problems, but Respondent did not obtain employment.  (*Id.* at 16, 60-61.)  Respondent, however, says that she did try to find a job but Petitioner did not want her to work and that she did get a nighttime job as a cleaner between 2006 and 2008 to help pay their debts.  (*Id.* at 105-06, 168.)

There is insufficient independent evidence to fully corroborate either Party's version of events.  Respondent explains that she did not tell her family or friends about the abuse because she was a very private person and she wanted her family to believe that she was still a successful person.  (*Id.* at 103.)  Respondent did testify that she told the manager of the child's nursery about Respondent's problems with the Petitioner – and the negative effect Respondent believed this was having on the child – and that the manager referred her to solicitors.  (*Id.* at 122.)  Respondent also testified that she reported the problems to the police but they declined to become involved in what they termed a custody issue; she also sought help from the Latino American Women's Rights Service ("LAWRS").  (*Id.*)

In May 2009 (when Respondent and the child were living in a shelter, which is explained *infra*), Respondent applied for permanent housing.  In connection with this application, the manager of the child's nursery sent an email to the shelter stating that the child had attended the nursery from July to December 2008 and that, during that period, Respondent told the manager that Petitioner "was very controlling and was emotionally abusive towards [Respondent]," including making "derogatory comments" about Respondent in front of the child and other

7

family members and threatening to take the child away from Respondent.  (RX6 at R0036.)[6]

The manager also indicated that she "often saw Respondent very upset because of the way

[Petitioner] treated her."  (*Id.*)  Respondent also requested a letter from LAWRS to support her

application for permanent accommodation.  (RX5 at R0034.)  LAWRS submitted a letter, dated

May 15, 2009, explaining that in August 2008, Respondent had contacted the organization "to

report the domestic violence she was been [sic] subjected to by her then husband" and that she

feared for her and her child's safety.  (*Id.* at R0035.)[7]  The letter states that Respondent was

offered an appointment to come and see the domestic violence support and prevention worker at

LAWRS, but that Respondent was unable to attend.  (*Id.*)  Respondent called LAWRS again a

few weeks later to report that the situation had worsened and that she needed to move out; after

the organization to which she was referred, the Latin Women's Refuge, was unable to assist her,

Respondent contacted the police who helped her find first a hotel and eventually a shelter.  (*Id.*)

After Respondent left Petitioner and took the child with her, Petitioner attempted to

locate Respondent and the child through the United Kingdom court system, as explained in more

detail *infra*.  As part of these attempts, he submitted disclosure orders to, inter alia, the police

station Respondent had contacted when she left.  (PX1 at Petitioner000069.)[8]  The response

letter submitted by the police indicates that when they interviewed Respondent in 2008, she

alleged that Petitioner "had mentally abused her and may have subjected her to sexual assaults

during the relationship[;] [s]he had therefore fled their home address and sought accommodation

---

[6] "RX" cites refer to the exhibits submitted by Respondent at the Evidentiary Hearing.

[7] Although the letter from LAWRS refers to Respondent's "husband," the Court assumes
that Respondent was reporting claims of abuse by Petitioner, her partner at the time.

[8] "PX" cites refer to the exhibits submitted by Petitioner at the Evidentiary Hearing.

in a refuge." (*Id.* at Petitioner000072.)  However, the "[p]olice could not make out any offences from the evidence that [Respondent] gave and were therefore unable to pursue a criminal investigation against [Petitioner]." (*Id.*)

When Respondent moved to New York, she was treated by the therapist who diagnosed her with post-traumatic stress disorder ("PTSD") based on her symptoms, which included heightened startle response, hypervigilance, nightmares, tearfulness, and flashbacks.  (Tr. 230-32.)  The therapist testified that when she first met Respondent, Respondent was panic-stricken and worried that Petitioner was going to find and harm her and potentially the child, and she seemed in fear for her life.  (*Id.* at 231.)  PTSD is exhibited by people who experience a traumatic event; in Respondent's case, the therapist based her diagnosis on Respondent's statements that she:  "fled her home because she had been sexually assaulted and physically and emotionally abused by her ex-partner;" had been in a shelter for domestic violence in the United Kingdom; and feared that Petitioner would find and harm her.  (*Id.* at 232.)  According to the therapist, Respondent told the therapist in their early treatment sessions that Petitioner had hit and raped her, although that information did not appear in the therapist's formal notes until December 2010; however, the therapist explains that she often included only symptoms, and not the details of a person's situation, in her notes for confidentiality reasons.  (*Id.* at 240-42, 248.) The therapist denies that she did not mention the physical and sexual abuse in her notes because she felt it was unimportant; instead, she maintains that the failure to include it may have been an oversight.  (*Id.* at 249.)

The Court finds that Petitioner's claims that he never insulted or mistreated Respondent in any manner are not credible.  Although presented in a hearsay format, there is evidence from third parties that Respondent contemporaneously reported that Petitioner was emotionally

9

abusive towards her.  Additionally, it is extremely unlikely that Respondent would choose to flee her home with her child, and live in a shelter environment that she described as very unpleasant and stressful, for absolutely no reason.  Moreover, the therapist's diagnosis of Respondent with PTSD, and the therapist's description of Respondent's symptoms, also indicate that Respondent suffered trauma.  However, there is no evidence, other than Respondent's testimony and the testimony of the therapist and Dr. Cling based on Respondent's self-reporting, that Petitioner physically abused or raped Respondent.  Therefore, the Court cannot – and, in light of the Court's conclusion, explained *infra*, that Respondent has not established that returning the child to London for a custody determination would pose a grave risk to the child, need not – make more precise findings regarding the abuse that may have occurred.

### B.  Petitioner's Relationship with the Child

The Parties' first pregnancy resulted in a miscarriage in October 2004, but Respondent became pregnant again in January 2005.  (Tr. 107-08.)  On October 21, 2005, the subject child was born in London.  (Ct. Ex. 1 ¶ A3.)  Petitioner and Respondent are listed as parents on the child's birth certificate.  (*Id.* ¶¶ A4-5; Pet. Ex. E.)  Petitioner, Respondent, and the child all lived together in London from the child's birth until November 19, 2008.  (Ct. Ex. 1 ¶ A6.)  According to Petitioner, after the child was born, "everything was happiness for everyone."  (Tr. 14.)  Although he was unable to spend much time with the child on weekdays because of his work schedule, Petitioner believes that he had a very good relationship with the child, and tried to spend whatever free time he had with her.  (*Id.* at 17, 74-75.)  Petitioner testified that the child laughed and was happy, but acknowledged that the child was not speaking when at the nursery.  (*Id.* at 77-79.)  In contrast, Respondent testified that while living with Petitioner, the child was very quiet and depressed, did not smile, and would have tantrums.  (*Id.* at 120.)

The child began to have a series of problems, including refusing to speak at the nursery, crying a lot, not smiling, having nightmares from which she woke up screaming, bed-wetting, and clinging to Respondent; Respondent testified that in October 2008, she spoke to the child's doctor about these issues because she was very worried. (*Id.* at 127, 176.)  The doctor's records state that the child "talks, laughs and dances in front of parents[] but is withdrawn in the nurse[r]y"; the cause was unknown and the nursery wanted Respondent to consult a specialist. (RX1 at R0003.)  However, Respondent testified that when Petitioner was not around, the child was talkative and had fun with Respondent but denied that the child laughed and talked in front of Petitioner.  When showed the doctor's notes, Respondent stated that she told the doctor the child behaved normally at home but did not specify in front of both parents.  (Tr. 176-77.)  In the email sent by the nursery manager in connection with Respondent's application for permanent housing, the manager wrote that the home "environment obviously had a negative effect upon [the child] and [she] became an elective mute at the nursery ([she] chose not to speak, although [she] had the language) and became very withdrawn."  (RX6 at R0036.)  The therapist testified that being withdrawn can be a symptom of trauma.  (Tr. 251.)

At the Evidentiary Hearing, Petitioner denied that he and Respondent often argued in front of the child, although he acknowledged that the child was sometimes present in the home during, and thus aware of, these arguments.  (*Id.* at 71-72.)  Yet, in papers Petitioner submitted in July 2009 in London in connection with his attempts to locate the child, he stated that he and Respondent "would often argue in front of the child[]"; however, he "always tried to avoid this so that his [child] would not be distressed."  (PX1 at Petitioner000047.)  He also indicated that Respondent had mental health issues and that she would "verbally abuse [Petitioner] in front of the child and call [Petitioner] abusive names" to try and "turn the child against" Petitioner,

11

including telling the child that Petitioner "was evil like the devil," which "resulted in the child pointing to bad objects and calling them Daddy." (*Id.*)

In light of his earlier statements, Petitioner's testimony that he and Respondent never argued in front of the child, and that he "never raise[d] [his] voice to [Respondent] in any argument that [they] had" (Tr. 72), is not credible. Yet, the Court is cognizant of the desire of the Parties to portray themselves in the best light possible and, therefore, does not infer from these statements that Petitioner is incredible with respect to all of his testimony, as Respondent has asserted.

Respondent also claims that Petitioner may have inappropriately touched the child. According to Respondent, when she and the child were living in a domestic violence shelter in London after leaving the Petitioner, the child pointed to her genital area and said that Petitioner had touched her there. (*Id.* at 129-30.) Respondent claims that she reported this to the shelter, but was told that there was nothing she could do because she had no evidence; she did not report it to the police. (*Id.* at 130, 178.) Respondent also describes an incident where Petitioner's mother told Respondent not to let Petitioner bathe the child. (*Id.* at 128-29.)

Respondent also testified that she told the therapist about the child saying that Petitioner had touched her genitals. (*Id.* at 181-82.) Yet, according to the therapist, Respondent said that she did not think that Petitioner would have inappropriately touched or done anything to the child, but she did not know whether he had or not, which worried Respondent. (*Id.* at 242.) The child never told the therapist that Petitioner touched her but the therapist opined that the child's actions indicated that the child was afraid of Petitioner. According to Respondent, the child has exhibited encropesis (soiling herself with a bowel movement) since the possibility of seeing Petitioner again has been raised, which the therapist explained is often a symptom of terror and

trauma; the therapist has not witnessed the encropesis, but believes Respondent's account.  (*Id.* at 242-43.)  However, in February 2010, the child also told the therapist the she missed Petitioner.  (*Id.* at 243-44.)   Respondent also told the therapist about two incidents at school where the child said that a female teacher had touched her inappropriately and that a classmate had kissed her, which led to the child being assigned to a new classroom.  (*Id.* at 244-45; PX3 at R0108.)  Respondent did not mention the possibility that Petitioner had inappropriately touched the child when Respondent relayed these incidents to the therapist.  (Tr. 245-46.)   For his part, Petitioner denies ever yelling at, hitting, slapping, or inappropriately touching the child.  (*Id.* at 70.)

The Court finds that there is insufficient evidence to conclude that Petitioner either sexually or otherwise physically abused the child in any manner.  Respondent's account suffers from insufficient corroborating evidence and, indeed, is inconsistent with some other evidence in the record.  Given her self-interest in the matter, the Court therefore finds that there is insufficient evidence to support a finding that Petitioner sexually or otherwise abused the child.

### C.  Respondent Leaves Petitioner with the Child

In November 2008, Respondent came to New York to visit her sister Maria and attempt to gather evidence to support Respondent's and Petitioner's case regarding the problematic loan. (*Id.* at 19, 119, 167-68.)  During this time, the child stayed in London with Petitioner and Petitioner's mother who was visiting from Colombia.  (*Id.* at 74, 168.)  Petitioner claims that when he picked Respondent up at the airport upon her return, Respondent "was a completely different person" than when she left London a week earlier and she demanded that Petitioner and

his mother leave their house immediately.  (*Id.* at 20-22.)[9]  Respondent testified that when she

returned from New York, Petitioner and his mother were acting very suspicious and the child

was acting fearful and strange around Petitioner; Respondent became extremely scared, and

decided to leave.  (*Id.* at 134-35.)

On the following day, November 19, 2008, Respondent left to bring the child to nursery

school and never returned.  (Tr. 22; Ct. Ex. 1 ¶ A7.)  Respondent testified that she went to the

police station and reported that Petitioner had been abusing her; the police asked Respondent if

she wanted to have Petitioner arrested but she declined out of concern for Petitioner's mother

and, instead, asked the police to remove Petitioner from their house.  (Tr. 135-36.)  However,

according to Respondent, when she told the police that she did not work and that Petitioner did

work, the police said that they could not "do anything for [her]," but they did give her a personal

alarm and helped her find a hotel.  (*Id.* 136-37.)  The next day, Petitioner saw Respondent and

the child while he was driving; Respondent ran away.  (*Id.* at 23.)  Respondent testified that after

seeing Petitioner in the car she filed another police report; the police did not do anything for

them but sent Respondent and the child to a domestic violence shelter.  (*Id.* at 137-39.)

Petitioner testified that when he called Respondent after seeing them in the car, Respondent

informed him that she had reported him to the police; however, when he went to the station, the

police had no records of Petitioner.  (*Id.* at 23-24.)  Petitioner has not seen the child since.

Petitioner testified that right after Respondent left, he called Respondent's sister Gloria,

who lived in London and who denied knowledge of Respondent's whereabouts.  (*Id.* at 23.)  In

---

[9] Respondent testified that prior to November 2008 she had asked Petitioner to leave
many times but that he always threatened her in response (Tr. 134); Petitioner denied that
Respondent ever asked him to move out before November 2008, (*id.* at 85).

December 2008, Respondent's sister Nancy called Petitioner and told him it would be better if

he stayed away from Respondent and the child if he didn't "want trouble" or "want to be sorry."

(*Id.* at 25-26.)  Right after that call, Petitioner received another call from Gloria regarding

Respondent's belongings and informing Petitioner that Respondent was living in a refuge and

protected by the police.  (*Id.* at 26; PX1 at Petitioner000009.)  Subsequently, Petitioner's

solicitors told him to refrain from speaking with any member of Respondent's family.  (Tr. 27.)

Respondent and the child resided at a shelter, Croydon Women's Aid, from November

24, 2008, until July 3, 2009.  (Ct. Ex. 1 ¶ A8.)  Before entering the shelter, Respondent was

interviewed by the shelter and submitted forms and a statement describing her claims of abuse.

(Tr. 139.)  Respondent also signed a license agreement upon entering the shelter.  (RX2.)  The

agreement states that the objective of the organization is to provide "[s]afe emergency temporary

accommodation where women and children can find refuge from violence in the home."  (*Id.* at

R0006.)  The length of stay at the shelter was not expected to exceed six months and the original

license was from November 24, 2008, until February 23, 2009.  (*Id.* at R0005, R0007.)

Respondent testified that the shelter was not healthy for her or for the child; therefore, she tried

to obtain alternative housing.  (Tr. 131-32.)  In connection with this attempt, she requested a

letter from LAWRS to support her application for permanent accommodation.  (RX5 at R0034.)

The LAWRS letter describes Respondent's interactions with LAWRS, as discussed *supra*, and

states that Respondent wanted a permanent accommodation to start a new life with more stability

because the "unsuitable and overcrowded conditions" of the shelter, with other domestic

violence victims under a lot of stress, were hindering the development of both Respondent and

the child.  (*Id.* at R0035.)  Respondent testified that before she left Petitioner, she would

sometimes go to her sister Gloria's house for the weekend when Respondent and Petitioner had

problems; Gloria had a son about the same age as the child and the child and Gloria's son were friends.  (Tr. 174-75.)  However, Respondent and the child were only able to see Gloria and her son once while living in the shelter because the shelter did not want Respondent at her family's homes.  (*Id.* at 175.)

On July 3, 2009, Respondent and the child left the United Kingdom, traveling first to France and then to New York, where they have lived since July 8, 2009.  (Ct. Ex. 1 ¶¶ A12-14).

Petitioner describes a multitude of channels that he pursued in an attempt to find his child and resolve the situation.  He contacted the Citizen Advice Bureau in London, where he was referred to Family Mediation; after Family Mediation sent several letters to Respondent without response, Petitioner was referred to solicitors in London.  (Tr. 24-25.)  On July 23, 2009, Petitioner submitted an application under the Children Act of 1989 (PX1 at Petitioner000030-Petitioner000049), to obtain from a court "a defined contact order to ensure that he obtains regular contact with his [child] and plays an active role in [her] life," (*id.* at Petitioner000037).  At the same time, Petitioner submitted orders to disclose the child's whereabouts, under Section 33 of the Family Law Act of 1986, to Respondent's sisters in London, Respondent's previous counsel, the police station that Respondent had contacted, the Child Benefit Office, the child's nursery, and the child's doctor (*id.* at Petitioner000050-Petitioner000067); however, they all denied knowledge of Respondent's and the child's location, (*id.* at Petitioner000068-Petitioner000076).  After having "exhausted all possibility that [the child] was still in the [United Kingdom]," on March 15, 2010, Petitioner filed a Central Authority for England and Wales Application Form seeking to have the child returned to the United Kingdom; the application was sent to the United States Department of State Office of Children's Issues on March 23, 2010.  (Tr. 33; Ct. Ex. 1 ¶ A15.)  The application details more of the steps that Petitioner undertook to

16

find Respondent and the child and indicates that Petitioner believed that Respondent and the child were in Manhattan.  (PX1 at Petitioner000005-Petitioner000009.)[10]  At the hearing, Petitioner explained that he thought Respondent would bring the child to the United States at some point but he did not know when or how quickly she would be able to do so; therefore, he wanted to first make sure that Respondent and the child were not in the United Kingdom before taking action pursuant to the Hague Convention.  (Tr. 90-91.)

D.  The Child's Life in New York

Since arriving in New York, Respondent and the child have lived with Respondent's sister Maria, Maria's partner, Respondent's niece (Maria's daughter), and the niece's two-year-old daughter.  (Id. at 144.)[11]  Maria has worked as a nanny for the same family for four years;

---

[10] Petitioner had previously told his solicitors that he believed Respondent was in New York with her sister Maria because Respondent "wasn't very happy in London."  (Tr. 27.)  On July 23, 2009 (weeks after Respondent and the child had already left the United Kingdom), Petitioner indicated on an application that "when the Parties separated in November 2008, the Respondent threatened to take the child to the USA permanently" because she had siblings in the United States who would be able to support her; thus, Petitioner stated he was worried that Respondent might remove the child from the United Kingdom without his knowledge.  (PX1 at Petitioner000048-Petitioner000049.)  At the same time, Petitioner also believed that Respondent would possibly return to live in Colombia because she was born there and still had family there.  (Id. at Petitioner000048.)

In addition, Petitioner stated in his application that he did not have the address of Respondent's sister in New York but did have two contact phone numbers.  (Id. at Petitioner000005.)  However, at the hearing, Petitioner testified that when Respondent visited Maria in November 2008, Respondent left Maria's name, address, and phone number in writing with Petitioner.  (Tr. 88.)

[11] Petitioner has expressed concern that Respondent's sister and family members had drug problems because Respondent had told him that the police found cocaine in the garden and that Social Services had been involved.  (Tr. 34.)  Respondent testified that she had told Petitioner about an incident ten years ago when her niece's boyfriend was incarcerated for selling cocaine.  The niece's involvement is unclear because Respondent testified that the niece was not charged, but also that she has a felony in her past.  However, Respondent emphasized that neither her niece, nor any other family member, currently has a substance abuse problem.  (Id. at 149-50.)  The Court finds that there is insufficient evidence to determine that anyone

17

Maria's partner owns a grocery business.  (*Id.* at 144-45, 169.)  Maria financially supports
Respondent and the child and, in return, Respondent cooks, cleans, and takes care of the
children.  (*Id.* at 145.)  Respondent has not had a job since she came to the United States.  (*Id.* at
168.)  Because Respondent and the child have British passports, they were allowed to enter the
United States without a visa; however, Respondent testified that they are currently overstayed,
and have been since October 2009.  (*Id.* at 165-66.)  Respondent testified that she is consulting
with immigration authorities about the possibility of being sponsored by Maria, who is a United
States citizen.  (*Id.* at 150.)

The child has attended the same school since she and Respondent arrived in New York
and currently is enrolled in kindergarten; according to Respondent, the child is doing very well
in school.  (*Id.* at 147.)  On the child's 2009-2010 mid-year pre-kindergarten Academic
Standards Report, the child's teacher commented that she "is a quiet child who enjoys playing
with [her] friends at school[; she] is participating more now and [the school is] encouraging her
to write more and develop all skills."  (RX10 at R0045.)  On the Academic Standards Report at
the end of that school year, the teacher wrote that the child "has made a lot of progress socially
[and] is beginning to assert herself more[; she] is progressing academically as well."  (RX11 at
R0048.)

However, in a March 2010 session with the therapist, Respondent expressed concern that
the child's school had overreacted to the child's statements regarding the incidents where the
child claimed a teacher and student had inappropriately touched and kissed her; the therapist told
Respondent that the school might involve Child Protective Services ("CPS") and that

---

residing in the home currently has any involvement with drugs.

Respondent would need to be compliant, to which Respondent agreed.  (PX3 at R0108, R0110.)
The following week, Respondent told the therapist that she and the child were interviewed by the
school but were not contacted by CPS; however, Respondent was still upset with the school.  (*Id.*
at R0112.)

Respondent testified that the child has friends at school who she sometimes meets at the
park or at the library.  (Tr. 148.)  The child plays with her cousin's two-year old daughter with
whom they live, and is close with Maria and Maria's partner.  (*Id.* at 148-49.)  Respondent also
testified that her other niece also lives nearby with her two children and the child spends time
with this extended family, particularly on weekends.  (*Id.* at 149.)  Respondent and the child also
attend church on the weekends and the child takes ballet classes.  (*Id.* at 150.)

After arriving in New York, Respondent and the child began receiving therapy from a
psychiatric social worker at a family medical clinic in July 2009.  (*Id.* at 230.)  When they first
arrived in New York, Respondent testified that the child was very quiet, had nightmares and bed-
wetting problems, and became "very sexually talking."  (*Id.* at 145-46.)  At the hearing, the
therapist testified that when she first met the child, the child was unable to speak, make eye
contact, or play in the therapist's office, which the therapist characterized as "very unusual for a
normally developed three-year-old child"; in addition, the child would wet herself, was
hypervigilant, and had a very heightened startle response.  (*Id.* at 233.)  In addition, the
therapist's notes from a November 17, 2009 session indicate that the child had been having
temper tantrums at home and yelling and slamming doors when she did not get what she wanted;
as a result, the therapist sought "to lower [the child's] anxiety when she's separated from her
mother and decrease [the child's] aggressive behavior when [her] personal needs are not met."
(PX3 at R0095.)  Although the therapist testified that the child showed symptoms of trauma in

their initial meeting, she progressed through several diagnoses, including adjustment disorder with anxiety/depression, adjustment disorder with mixed emotional features, adjustment disorder not otherwise specified, undetermined diagnosis, and undiagnosed, before ultimately being diagnosed with PTSD in February 2010; the therapist explained this is often done because a diagnosis such as PTSD can be stigmatizing in children.  (Tr. 233-34; PX3 at R0087-R0104.) When asked at the Evidentiary Hearing what traumatic event formed the basis of the PTSD diagnosis, the therapist said it was the child's experience in the United Kingdom before coming to New York, including living in a shelter system, having to move to a new country, and knowing that her mother had been harmed or threatened because, as the therapist explained, being in the presence of abuse is considered trauma to the child, even if the child herself is not abused.  (Tr. 234-35.)  The therapist declined to say definitively that the traumatic event was witnessing domestic violence, although she said that could cause the trauma.  (*Id.* at 239.)

Respondent testified that within six months of arriving in New York, the child's behavior improved.  (*Id.* at 146.)  The therapist echoed this assessment, describing her as "a completely different child now," who has stopped wetting herself, has made friends at school, is excited to play, and is able to speak very freely about how she is feeling and talks about being happy.  (*Id.* at 235-36.)  In August 2010, Respondent and the therapist decided to terminate therapy because the child was doing well and agreed that they would return if any of the child's symptoms related to trauma reoccurred.  (PX3 at R0120.)  In her notes, the therapist indicated that the child was "symptom free, happy, content, [and] normal."  (*Id.*)

However, the child resumed therapy in September 2010 when Respondent and the child again met with the therapist because the child was acting out regarding Respondent's new boyfriend.  (*Id.* at R0122.)  The next week, Respondent informed the therapist that the child was

20

still having problems with wetting herself; the therapist recommended that the child continue

therapy until the problem was resolved.  (*Id.* at R0124.)  By October 25, 2010, Respondent and

the therapist agreed that the child was again symptom free; the child was not wetting herself,

"reported 'being happy' and was markedly more verbal than during last visits."  (*Id.* at R0128.)

Accordingly, the child would cease therapy, but return if any problems resumed.  (*Id.*)

Respondent and the child again resumed meeting with the therapist in December 2010, after the

instant Petition was filed.  (*Id.* at R0130.)  In January 2011, the therapist noted that the child

"expressed she is 'happy' in school," was not wetting herself and, when playing with dolls,

"talked about how she was happy like the dolls who got to live in the dollhouse with their

cousins."  (*Id.* at R0134.)  Respondent and the therapist determined that the child and

Respondent would continue therapy through the duration of the instant proceedings.  (*Id.* at

R0135.)

      E.  Possibility of Return to United Kingdom and Expert Evaluations

      According to Respondent, when she brings up going back to London, the child says "that

she's not going." (Tr. 147.)  Respondent testified that when the child is asked if she wants to see

Petitioner, she says "no" and, on four occasions after being asked this question, the child has

become encropetic.  (*Id.*)  The therapist testified that when she asked the child about Petitioner,

she would remain silent and did not want to talk about him.  (*Id.* at 236.)  The child also did not

talk very much about her time in the United Kingdom in general and did not recall it.  (*Id.*)  The

therapist's February 17, 2010 notes state that the child was able to speak for the first time

directly with the therapist about missing her father; the notes from that same session also

indicate that the child was much more verbal in play with the therapist (PX3 at R0105), whereas

previously she still had been taciturn and communicated by pointing, (*id.* at R0103.)

Although the child had stopped attending therapy by the end of October 2010, Respondent and the child met with the therapist again on December 9, 2010, after the instant Petition had been filed.  At this session, the child "stated that she was scared because her 'mommy seemed so worried.'" (*Id.* at R0130.)  The therapist's notes from a January 31, 2011 session state that after refraining from asking the child direct questions regarding Petitioner for several months, the therapist did ask the child if she wanted to see her father; the child, outside the presence of Respondent, said "no."  The therapist did not probe the issue further in order to avoid distressing the child.  (*Id.* at R0144.)

Respondent's expert Dr. Cling submitted a report and testified at the Evidentiary Hearing based on her examination of Respondent and the child.  Dr. Cling testified that during her evaluation, Respondent told her that Petitioner had abused her and that the child witnessed the abuse.  Dr. Cling explained that witnessing domestic abuse is "considered to be abuse in and of itself."  (Tr. 196.)  Dr. Cling did not directly observe any symptoms of trauma in the child, but spoke with the therapist regarding the child's condition when she first arrived in New York.  (*Id.* at 204.)  When Dr. Cling met with the child, the child stayed with Respondent but was generally willing to talk, moved readily towards the provided toys, and related well.  (*Id.* at 197-98.)  Dr. Cling testified that when she tried to speak with the child about her time in London or Petitioner, the child "had a very bad reaction"; after initially saying in very short answers that she remembered London and Petitioner, the child said she did not want to talk about it and refused to discuss the subject.  (*Id.* at 188-89, 206-07.)  Dr. Cling viewed this as the child setting a limit where she felt safe and, therefore, Dr. Cling did not push the child "to an extreme response." (*Id.* at 208.)  The child did not wet or soil herself when Dr. Cling brought up Petitioner; however, Dr. Cling stated that such a response "would be psychotic behavior" that even a scared five-year-

old would not exhibit unless in "extreme distress."  (*Id.* at 207.)  When asked about Respondent's testimony that the child had exhibited such a response after being asked about Petitioner and returning to London, Dr. Cling clarified that such behavior would have been surprising in the setting of her interview of the child because Dr. Cling did not push her hard, so the child was in a safe situation.  (*Id.* at 207-08.)  Dr. Cling testified that if in their meeting the child had been able to speak more about Petitioner – as the child was able to do with Dr. Fraser, when Respondent was not present in the room, as explained *infra* – it "might soften [her opinion in this case] a little."  (*Id.* at 211-12.)

Dr. Cling concluded the child was "potentially at risk if she were to be forcibly returned to the [United Kingdom] for custody evaluation of another psychological breakdown" and that such a move "could cause serious psychological harm."  (*Id.* at 190.)   Removing the child from her "stable environment in the United States . . . might have a catastrophic effect" because, while "it's not generally good to move children, . . . if they have a fragile history, then . . . you want to keep them as stable as possible . . . [and] more or less doing the same thing," particularly because here the child would be taken from her present stable, comfortable environment and returned to the site of the trauma.  (*Id.* at 198-99.)  This assessment was based on Dr. Cling's discussion with the therapist, who indicated that the child was in "pretty bad shape" and suffering from PTSD when she arrived in New York, as well as Dr. Cling's own observation that the child was now a "normal five-year-old" who is doing very well, "with the exception that there was this difficult psychological area" involving Petitioner and London.  (*Id.* at 190-91.)

When asked if there were any arrangements in the United Kingdom that could prevent the child's re-traumatization, Dr. Cling stated that it is "hard to imagine the kind of stable environment that she's already in existing there," particularly because the child has been in New

York for over a year and a half at a sensitive age.  (*Id.* at 199-200.)  However, Dr. Cling did not

provide any basis for her belief as to the child's situation in the United Kingdom.  When asked

by the Court if traumatization would result from moving the child from her current situation to

anywhere, as distinct from moving the child to the United Kingdom under arrangements that

would allow her to live with people with whom she might be comfortable, Dr. Cling opined that

both situations would contribute to the child suffering trauma.  (*Id.* at 200-01.)  When pressed by

Petitioner's counsel, Dr. Cling said she believes it is "very likely" that the child is at risk for

another psychological breakdown if returned to the United Kingdom but she cannot predict with

certainty what will happen if the child is returned.  (*Id.* at 205-06.)

Petitioner's expert Dr. Fraser also submitted a report, based on his psychological

evaluation of Respondent and the child, and testified at the Evidentiary Hearing.  Dr. Fraser met

with Respondent and the child both together and separately.  (*Id.* at 283; PX2 at Fraser000001.)

Dr. Fraser testified that he met with the child one-on-one in order to observe how the child

interacted both with and away from Respondent.  (Tr. 283.)  Dr. Fraser testified that Respondent

seemed very appropriately able to care for the child and was very attuned to her needs.  (*Id.* at

260.)  Respondent told Dr. Fraser that:  Petitioner had raped Respondent four times, twice in the

presence of the child; the child had told Respondent in the shelter that Petitioner had touched the

child's genitals; and the child had previously exhibited symptoms such as fearfulness, anxiety,

emotionally shutting down, refusing to talk, bed-wetting, and clinging to Respondent.  (*Id.* at

260-61.)  Dr. Fraser testified that the child seemed "to be a very well-adjusted, sweet child," who

engaged in very organized, healthy, creative, age-appropriate playing by herself and with

Respondent and Dr. Fraser and did not show any distress.  (*Id.* at 265-66, 284.)  The child told

Dr. Fraser that she loves where she lives and that she likes school.  (*Id.* at 298; PX2 at

24

Fraser000004.)

Dr. Fraser had Respondent fill out a trauma symptom checklist for young children for the child's trauma symptoms during the past month.  (Tr. 261-63.)  According to Dr. Fraser, Respondent reported extremely high PTSD avoidance and sexual concern symptoms for the child, which were inconsistent with:  (1) Dr. Fraser's own interview with the child, (2) Respondent's description of the child's current condition to Dr. Fraser and Dr. Cling, and (3) Respondent's discussion of the focus of the child's therapy.  (*Id.* at 264-65; PX2 at Fraser000005-Fraser000007.)  Dr. Fraser opined that this discrepancy "calls into question the accuracy and consistency of [Respondent's] reporting of events," particularly regarding her claims of potential sexual abuse of the child.  (PX2 at Fraser000007.)  Respondent testified that in filling out the questionnaire, she forgot that it was only supposed to be for the past month and thought it related to the child's symptoms upon arrival in New York.  (Tr. 151-52.)  However, the questionnaire responses indicate that Respondent did answer some of the questions with the past-month time frame in mind; for example, she answered "not at all" to the questions of whether the child looked sad or had nightmares, when those were in fact some of the symptoms for which Respondent had sought therapy for the child upon arrival in New York.  (PX2 at Fraser000014-Fraser000015.)

Dr. Fraser also had Respondent take a personality test known as the MMPI-2.  (Tr. 261.) This test has two components:  (1) validity scales, which provide information regarding the subject's test-taking attitude and approach, and (2) clinical scales, which provide information about the individual's personality style and psychiatric symptoms they may be experiencing. (*Id.* at 267-69; PX2 at Fraser000003.)  Dr. Fraser testified that Respondent's validity scores indicated that she tended to portray herself in an overly positive light with few shortcomings;

25

people with high scores often "have a difficult time admitting to minor faults that typically most human beings would admit to." (Tr. 281-82.) According to Dr. Fraser, Respondent's "unrealistic claims of personal virtue," "unwilling[ness] to admit faults that might be detrimental to her case," and "extreme level of defensiveness . . . made it difficult to interpret her clinical scores" (PX2 at Fraser000003), and thus called into question the accuracy of the rest of the reported information, (*id.*; Tr. 281-82.) In contrast, Dr. Cling did not administer any written tests to Respondent or the child because Dr. Cling believes that the MMPI-2 is often invalid in custody evaluations because "[p]eople who are undergoing custody evaluations have a very strong, perhaps uncontrollable, urge to present themselves in a very positive light." (Tr. 221.) However, Dr. Cling acknowledges that this test is very often given in custody disputes. (*Id.* at 226.)

Dr. Fraser testified that the child did not exhibit any traumatized or sexualized behavior in his presence, nor did she show any signs of incontinence. (*Id.* at 284-86.) When he brought up Petitioner, the child was able to answer questions regarding her father while continuing to play with a dollhouse and did not seem frightened of her father. (*Id.* at 284-85.) When asked how she feels about being away from Petitioner, the child replied "happy; I'm staying with my mommy." (*Id.* at 297-98.) The child was also able to talk about living in the United Kingdom without being afraid. When Dr. Fraser asked the child if she remembered the United Kingdom with her mother and father, the child said that she played with toys; at that point, she did not want to talk anymore and said she was hungry. (*Id.* at 286.) Dr. Cling categorized the child saying she was hungry as avoidance behavior to get out of talking about Petitioner (*id.* at 225); however, according to Respondent, after speaking with Dr. Fraser, Respondent actually did take the child to McDonald's to get something to eat before returning to Dr. Fraser's office to

26

complete the MMPI-2 questionnaire, (*id.* at 154).  Respondent testified that when she took the child to McDonald's, the child did not want to go back to the office and said that Dr. Fraser made her think a toy was her father, that she killed the toy, and there was "blood all around." (*Id.*)  However, Dr. Fraser testified that the child did not identify any of the dolls or toys as representing her father, nor discuss her father in an aggressive way.  (*Id.* at 267, 297.)

Dr. Fraser agreed with Dr. Cling that "'it is impossible to say what trauma [the child] was reacting to'" when she exhibited trauma symptoms upon arriving in New York, particularly without investigation into Respondent's claims that Petitioner may have sexually abused the child.  (PX2 at Fraser000006.)  He believes that several of the child's reported symptoms, such as bed-wetting, excessive clinging to her mother, and avoiding talking about her father, "could also have been reactions to several types of other traumas," such as being uprooted from her home and her father to live in a shelter while in the United Kingdom and then being uprooted from the United Kingdom to move to the United States, still away from her father.  (*Id.*)  Dr. Fraser acknowledged that given "the level of disruption and stress" in the child's life over the past couple of years, the child "is at increased risk for some degree of psychological maladjustment if she is required to move again; but the potential negative effects depend on many factors."  (*Id.* at Fraser000007.)  However, he opined that returning to the United Kingdom would not put the child at a grave risk of harm (*id.*), and that, based on his observations of the child, her answers to his questions, and the description of her symptoms from other sources, he did not think that the child would be traumatized, or that it would be a problem, for the child to return to the United Kingdom for the purposes of conducting a custody hearing.  (Tr. 287-88.)  In his report, Dr. Fraser did state that if the child was told that returning to the United Kingdom meant going back to her father, she "may react by regressing" and showing previous symptoms;

however, Dr. Fraser believes there are "other, more positive ways" to frame moving back to the United Kingdom to the child.  (PX2 at Fraser000007; Tr. 304.)  When asked if the child would suffer trauma if she was returned to Petitioner, Dr. Fraser cautioned that whenever allegations of abuse have been made, he believes "all efforts need be made to investigate the validity, the accuracy of those allegations prior to returning any child to that home."  (Tr. 303.)

## II.  Conclusions of Law

### A.  General Principles

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented through ICARA, was created with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention, pmbl., *reprinted in* 51 Fed. Reg. 10,495, at 10,498.  The Hague Convention was designed to restore the pre-retention status quo and to discourage parents from crossing international borders in search of a more sympathetic forum.  *See Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (citing Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 1-3 (1999)).  To dissuade family members from removing children to jurisdictions perceived to be more favorable to their custody claims, the Hague Convention attempts "to deprive [their] actions of any practical or juridical consequences."  *Id.* at 130 (quoting Elisa Perez-Vera, *Hague Convention on the Civil Aspects of Int'l Child Abduction: Explanatory Report*, ¶ 16, *in* 3 Acts and Documents of the 14th Session (1982) ("*Perez-Vera Report*")).[12]

_____

[12] "Perez-Vera served as the official Hague Convention reporter for the Convention and [] her explanatory report is recognized . . . as the official history and commentary on the

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim.  *See* Hague Convention, art. 16, *reprinted in* 51 Fed. Reg. 10,495, at 10,500; 42 U.S.C. § 11601(b)(4); *Diorinou v. Mezitis*, 237 F.3d 133, 140 (2d Cir. 2001).  The merits of any underlying custody claim are of no concern in a Hague Convention case.  *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999) ("*Blondin II*") (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*")); *see also* Hague Convention, art. 19, *reprinted in* 51 Fed. Reg. 10,495, at 10,500.  "Put differently, the focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country different from the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence."  *Hazbun Escaf  v. Rodriquez*, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002).

The United States has implemented the provisions of the Hague Convention through ICARA.  *See Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010).  ICARA allocates the burdens of proof for various claims and defenses under the Convention.  *See* 42 U.S.C. §§ 11601-11611; *Koc v. Koc*, 181 F. Supp. 2d 136, 146 (E.D.N.Y. 2001).  Specifically, ICARA requires that a petitioner establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A).  In this respect, the Convention reflects "a strong presumption favoring return

Convention and is a source of background on the meaning of the provisions of the Convention." *Blondin v. Dubois*, 189 F.3d 240, 246 n.5 (2d Cir. 1999) (alteration and internal quotation marks omitted).

29

of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002).  If a petitioner makes out a prima facie case of wrongful removal or retention, the court must return the child unless the respondent can establish one of the Convention's enumerated defenses.  *See Hazbun Escaf*, 200 F. Supp. 2d at 611.  The presumption favors return because "[r]equiring a return remedy in cases [brought under the Convention] helps deter child abductions and respects the Convention's purpose to prevent harms resulting from abductions."  *Abbott*, 130 S. Ct. at 1996.  As the Supreme Court has explained, such abductions are traumatic for children and are considered by some child psychologists to be "one of the worst forms of child abuse"; as a result of an abduction, the child may experience depression, PTSD, identity-formation issues, or other psychological problems, and may be prevented "from forming a relationship with the left-behind parent."  *Id.* (internal quotation marks omitted).

To establish a prima facie case of wrongful retention under the Hague Convention, a petitioner must show by a preponderance of the evidence that:  (1) the habitual residence of the child immediately before the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention.  *See* 42 U.S.C. § 11603(e)(1)(A); *Gitter*, 396 F.3d at 130-31.  If the petitioner satisfies this burden, then the child must be returned to his or her state of habitual residence unless the respondent can establish one of the following affirmative defenses:  (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment (the "settled defense" or "Article 12 defense"); (2) the person seeking return of the child was not actually exercising custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that

30

the return of the child would expose it to physical or psychological harm (the "grave risk defense"); or (4) the return of the child would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. *See Blondin II*, 189 F.3d at 245-46.  The first two affirmative defenses require proof by a preponderance of the evidence, while the latter two affirmative defenses require clear and convincing evidence. *See id.*

However, as is clear from ICARA, these affirmative defenses are meant to be narrow. *See id.* at 246 (citing 42 U.S.C. § 11601(a)(4)).  Indeed, these defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Id.*; *see also Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) ("It is not relevant to this Convention exception [the "grave risk defense"] who is the better parent in the long run . . . .").  To view the defenses more broadly would frustrate the core purpose of the Hague Convention – to preserve the status quo and deter parents from seeking custody of their child through, in effect, forum shopping.  *See Perez-Vera Report*, *supra*, ¶ 34.

Moreover, "[e]ven where the respondent meets his or her burden to show that an exception applies, the court may nevertheless exercise discretion to order repatriation." *Matovski v. Matovski*, No. 06-CV-4259, 2007 WL 2600862, at *7 (S.D.N.Y. Aug. 31, 2007); *see also Blondin II*, 189 F.3d at 246 n.4 ("[E]ven where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent."); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("*Friedrich II*") ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the

31

Convention.").

### B. The Prima Facie Case of Wrongful Retention

In the instant matter, Petitioner has adequately established a prima facie case of wrongful retention under the Hague Convention.  Indeed, as Petitioner points out, Respondent has not attempted to argue otherwise.  (Post-Hearing Mem. of Law in Supp. of Pet. for Return of Child ("Pet'r Mem.") 5.)

### 1.  The Habitual Residence

Petitioner can invoke the protection of the Hague Convention only if the subject child is "habitually resident" in a State signatory to the Convention and has been removed to or retained in a different State.  *See Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004); *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 341 (E.D.N.Y. 2004).  The Hague Convention itself does not provide any definition of "habitually resident."  *See Gitter*, 396 F.3d at 131; *Perez-Vera Report*, *supra* ¶ 53 ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms . . . .").  However, its text does direct courts to the time "immediately before the removal or retention."  Hague Convention, art. 3, *reprinted in* 51 Fed. Reg. 10,495, at 10,498.  In focusing on the pre-retention period, the relevant inquiry is the shared intention of those responsible for fixing the child's place of residence, which typically will be the child's parents.  *See Gitter*, 396 F.3d at 132.  However, the Court may also look to other factors in determining the child's habitual residence.  *See id.* at 133-34.

Here, the Court concludes that the child was a habitual resident of the United Kingdom.[13]

---

[13] Both the United Kingdom and the United States are signatories to the Hague Convention.  *See* Hague Convention (Multilateral Treaty) on International Child Abduction Enters into Force on July 1, 1988, 53 Fed. Reg. 23,843 (June 24, 1988).

The child resided there from its birth until Respondent and the child left on July 3, 2009; thus, at the time immediately before the removal, the child resided in the United Kingdom.

### 2.  Removal in Breach of Custody Rights Under Foreign Law

Under the Convention, "rights of custody" may arise, inter alia, by operation of law, *see* Hague Convention, art. 3, and "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence," *id.*, art. 5(a), *reprinted in* 51 Fed. Reg. 10,495, at 10,498.  United Kingdom law provides that "[w]here a child's father and mother were not married to each other at the time of his birth . . . the father shall have parental responsibility for the child if[, inter alia,] he becomes registered as the child's father." Children's Act of 1989, c. 41, § 4(1)(a).  Here, Petitioner is listed as the father on the child's birth certificate (Ct. Ex. 1 ¶ A4); accordingly, he has parental responsibility for and custody rights of the child under U.K. law.  In addition, U.K. law provides that absent a court order, it is a criminal offense for one parent to take a child under sixteen years old out of the United Kingdom for more than one month without the consent of the other parent.  *See* Child Abduction Act 1984, c. 37, §§ 1, 4(b); *see also Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 203 (E.D.N.Y. 2010).  Therefore, Respondent's removal of the child to the United States, without Petitioner's consent, breached Petitioner's custody rights.

### 3.  Petitioner was Exercising Custody Rights at the Time of the Removal

Lastly, to establish that Respondent's removal of the child was wrongful, Petitioner must establish that at the time of removal his custody rights "were actually exercised, either jointly or alone, or would have been so exercised but for the removal."  Hague Convention, art. 3(b), *reprinted in* 51 Fed. Reg. 10,495, at 10,498.  At the time Respondent removed the child from the family home in November 2008, Petitioner was clearly exercising his custody rights, as he lived

with and provided financial support and other care for the child.  During the seven months

between when Respondent removed the child from the home and when Respondent and the child

actually left the United Kingdom, Petitioner would have exercised his custody rights if not for

Respondent's retention of the child without Petitioner's knowledge of their whereabouts.

Respondent has not argued to the contrary.

Accordingly, Petitioner has established a prima facie case of wrongful retention under the

Hague Convention.

### C.  Affirmative Defenses

Because Petitioner has established a prima facie case under the Convention, the child

must be returned to the United Kingdom as her place of habitual residence unless Respondent

can establish one of four narrow defenses.  *See Blondin II*, 189 F.3d at 246.  Respondent argues

that two defenses apply here – the grave risk defense and the settled defense.  (Post-Trial Mem.

of Law in Opp'n to Pet. for Return of Child to Pet'r ("Resp't Mem.") 2.)  Petitioner asserts that

Respondent has failed to establish that either exception applies.  (Pet'r Mem. 7.)

### 1.  The Grave Risk Defense

The Convention provides that the Court "is not bound to order the return of the child if

the person . . . which opposes its return establishes that . . . there is a grave risk that his or her

return would expose the child to physical or psychological harm or otherwise place the child in

an intolerable situation."  Hague Convention, art. 13(b), *reprinted in* 51 Fed. Reg. 10,495, at

10,499.  Respondent must establish this defense by "clear and convincing evidence."  42 U.S.C.

§ 11603(e)(2)(A).  This defense recognizes that "[t]he interest of the child in not being removed

from its habitual residence . . . gives way before the primary interest of any person in not being

exposed to physical or psychological danger or being placed in an intolerable situation."

*Blondin v. Dubois*, 238 F.3d 153, 161 (2d Cir. 2001) ("*Blondin IV*") (second alteration in

original) (internal quotation marks omitted).  However, "[t]he level of risk and danger required

to trigger this exception has consistently been held to be very high."  *Norden-Powers v.*

*Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000).

The Second Circuit has explained that when the grave risk defense is asserted, a court

must determine what type of harm might result from repatriation:

> [A]t one end of the spectrum are those situations where repatriation might cause
> inconvenience or hardship, eliminate certain educational or economic
> opportunities, or not comport with the child's preferences; at the other end of the
> spectrum are those situations in which the child faces a real risk of being hurt,
> physically or psychologically, as a result of repatriation.  The former do not
> constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin IV*, 238 F.3d at 162.  Indeed, Article 13(b) "was not intended to be used by defendants

as a vehicle to litigate (or relitigate) the child's best interests."  Public Notice 957, Hague

International Child Abduction Convention; Text and Legal Analysis, app. C ("State Dep't Legal

Analysis") § III(I)(2)(c), 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986).  "Only evidence directly

establishing the existence of a grave risk that would expose the child to physical or emotional

harm or otherwise place the child in an intolerable situation is material to the court's

determination.  The person opposing the child's return must show that the risk to the child is

grave, not merely serious."  *Id.*; *see also Friedrich II*, 78 F.3d at 1069 (holding that the grave

risk exception is narrow and should only apply either:  (1) when return would place the child in

imminent danger, such as returning the child to a war-zone, place of famine, or site of disease; or

(2) in cases of serious abuse or neglect when courts in the home country would be incapable or

unwilling to adequately protect the child).  For instance, the Department of State has noted that a

parent sexually abusing a child would clearly be an example of an "intolerable situation" and, if

the other parent removed the child to protect it from further abuse, a court could deny a petition brought by the abusing parent for the child's return because "[s]uch action would protect the child from being returned to an 'intolerable situation' and subjected to a grave risk of psychological harm."  State Dep't Legal Analysis § III(I)(2)(c), 51 Fed. Reg. at 10,510.

The Second Circuit laid out the contours and requirements of the grave risk defense in the case of *Blondin v. Dubois*.  The district court had determined that the evidence clearly established that the petitioner father had physically abused the respondent mother, often in the presence of their children, and that he had also beaten one of the children; therefore, returning the children to their father in France would place them at grave risk of physical or psychological harm.  *See Blondin v. Dubois*, 19 F. Supp. 2d 123, 127-28 (S.D.N.Y. 1998) ("*Blondin I*").  On appeal, the Second Circuit remanded for consideration of whether any arrangements might mitigate the risk of harm to the children and allow them to safely return to France.  *See Blondin II*, 189 F.3d at 248 (stating that "it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation").  The Second Circuit emphasized that even if a district court finds a grave risk of harm, it also must consider whether it could protect a child from that harm "while still honoring the important treaty commitment to allow custody determinations to be made – if at all possible – by the court of the child's home country."  *Id.*

On remand, the district court consulted with French and American authorities and child psychology experts and found that there was clear and convincing evidence that returning the children to France, under any arrangement, would expose them to a grave risk of harm.  *See Blondin v. Dubois*, 78 F. Supp. 2d 283, 285 (S.D.N.Y. 2000) ("*Blondin III*").  The court was

presented with expert testimony that while in France, the older child had suffered from a severe traumatic disorder caused by her father's physical and verbal abuse of her and her mother; since coming to the United States, she had significantly, but not fully, recovered. *See id.* at 290-91. Accordingly, the expert believed that "removing the children from [their current] secure environment to return them to France would 'almost certainly' trigger a recurrence of the traumatic stress disorder they suffered in France–i.e. a post-traumatic stress disorder." *Id.* at 291. The court accepted these findings, and concluded that "[*a*]*ny* return of [the children] to France, the site of their father's sustained, violent abuse, including even a temporary one-to-three month return in the custody of their mother, would trigger this post-traumatic stress disorder." *Id.* at 295 (emphasis in original). While the court acknowledged that returning a child is likely to present adjustment concerns in almost every Convention case, it concluded that *Blondin* differed from the typical case because of the specific evidence of severe abuse suffered by the children, therefore making it far more likely that they would suffer long-term permanent harm if returned. *See id.* at 297. Thus, no measure could mitigate the grave risk of harm because returning to France, by itself, would cause the children psychological harm. *See id.* at 297-98.

On appeal, the Second Circuit held that absent any contravening evidence, it would not disturb the district court's finding that even with all possible mitigating arrangements in place, "the children face an almost certain recurrence of traumatic stress disorder on returning to France because they associate France with their father's abuse and the trauma they suffered as a result"; thus, there was "nothing the French authorities could do to protect the children from the harm they face in this particular situation, because their mere presence in France, the site of their

trauma, would create the risk." *Blondin IV*, 238 F.3d at 161.[14]  However, the court reiterated that "[i]n cases of serious abuse, before a [district] court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country." *Id.* at 163 n.11.

Applying these standards after *Blondin*, district courts within the Second Circuit that have denied repatriation under the grave risk exception have done so in cases involving very serious abuse.  *See, e.g.*, *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408-09 (E.D.N.Y. 2005) (denying repatriation because the petitioner had physically abused the respondent and the children and had repeatedly threatened the respondent and her family since the respondent came to the United States, and there was uncontroverted expert testimony that the children would suffer relapse of their PTSD symptoms by merely returning to Israel, even if they had no contact with the petitioner); *Reyes Olguin v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094, at *2-4, *11-12 (E.D.N.Y. Jan. 13, 2005) (denying petition to order return of children to Mexico because the record showed that the petitioner frequently and viciously beat the respondent in front of the children, the children told a psychiatrist that their father hit them as well, and there was uncontroverted expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child).[15]

---

[14] The Second Circuit also found that the district court did not err in considering evidence that the children had become well-settled in the United States as a non-dispositive factor in analyzing whether returning them to France would pose a grave risk to their psychological harm, because removing them from their current safe environment where they had begun to recover from their trauma would add to the harm they would suffer upon returning to the site of the original trauma.  *See Blondin IV*, 238 F.3d at 165.

[15] Courts outside the Second Circuit have also applied a high threshold to the grave risk exception, finding that the defense was established in situations of extreme physical abuse.  *See, e.g.*, *Van De Sande v. Van De Sande*, 431 F.3d 567, 569-70 (7th Cir. 2005) (reversing

However, the Second Circuit cautioned that its decision in *Blondin* "by no means implies that a court must refuse to send a child back to its home country in *any* case involving allegations of abuse, on the theory that a return to the home country poses a grave risk of psychological harm"; instead, a court must look at the "specific facts presented in th[e] case" at issue. *Blondin IV*, 238 F.3d at 163 n.12 (emphasis in original).  And, in fact, several courts within the Second Circuit have granted a petition for return despite some evidence of abuse. *See, e.g.*, *Rial v. Rijo*, No. 10-CV-1578, 2010 WL 1643995, at *2-3 (S.D.N.Y. Apr. 23, 2010) (ordering the return of the child to Spain, despite evidence that the petitioner was verbally and sometimes physically abusive to the respondent, including at times in front of the child, because the court concluded that the risk of harm to the child was not grave if the child returned with the respondent, and the petitioner agreed to rent an apartment and provide financial support for the respondent and the child until a Spanish court determined custody and support); *Lachman v. Lachman*, No. 08-CV-4363, 2008 WL 5054198, at *9 (E.D.N.Y. Nov. 21, 2008) (concluding that evidence that the petitioner previously had been arrested, but found not guilty, on domestic abuse charges in England was insufficient to establish that returning the child to England would pose a grave risk of harm to the child, where there was no evidence that the petitioner had ever harmed the child); *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *8-9 (E.D.N.Y.

---

repatriation order where the petitioner had severely and repeatedly beaten respondent in front of their children and threatened to kill the children); *Danaipour v. McLarey*, 386 F.3d 289, 301-03 (1st Cir. 2004) (affirming district court's refusal to return children where there was clear and convincing evidence that the petitioner sexually abused one child and that both children would suffer psychological harm if returned to Sweden); *Walsh v. Walsh*, 221 F.3d 204, 219-21 (1st Cir. 2000) (reversing repatriation order where petitioner severely beat respondent in front of children and undertakings would be insufficient because petitioner had a history of disobeying court orders); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (denying petition for return where petitioner belt-whipped, punched, and kicked the child, and choked and broke the respondent's nose).

May 7, 2008) (concluding that there was insufficient evidence to establish that the child would be at grave risk if returned to Colombia, where the petitioner had been violent to the respondent but there was no evidence that the petitioner physically abused the child).

Moreover, "[i]n th[e] [Second] Circuit, . . . even incontrovertible proof of a risk of harm will not satisfy the Article 13(b) exception if the risk of harm proven lacks gravity." *Laguna*, 2008 WL 1986253, at *8 (citing *Blondin IV*, 238 F.3d at 162).  "Courts have recognized that a child's observation of spousal abuse is relevant to the grave-risk inquiry . . .[, as is] [a] parent's general pattern of violence." *Elyashiv*, 353 F. Supp. 2d at 408; *see also Rial*, 2010 WL 1643995, at *2 ("Prior spousal abuse, though not directed at the child, can support the grave risk of harm defense.").  However, courts that have invoked the grave risk exception "have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse[, whereas] [e]vidence of sporadic or isolated incidents of abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the 'grave risk' exception." *Laguna*, 2008 WL 1986253, at *8 (citation omitted).

Applying these principles to the present case, Respondent must establish by clear and convincing evidence that the child would be exposed to a grave risk of harm if returned to the United Kingdom.  However, "subsidiary facts need only be proven by a preponderance of the evidence." *Elyashiv*, 353 F. Supp. 2d at 404 (alteration and internal quotation marks omitted).  As noted *supra* in the Findings of Fact section, the Court finds that a preponderance of the evidence indicates that Petitioner engaged in emotionally abusive conduct towards Respondent.  Although Respondent may not have proven that Petitioner made all the statements that she attributed to him (in terms of both frequency and content), Petitioner's claim that he never mistreated Respondent through any verbal abuse is simply not credible in light of:  (1) the

40

supporting evidence that Respondent had contemporaneously mentioned the psychological abuse to other people in the United Kingdom; (2) Respondent's actions in fleeing to the domestic abuse shelter, which the Court finds that a person would not do for no reason whatsoever; and (3) Respondent's PTSD diagnosis upon arriving in New York.

However, the Court is presented with much less evidence regarding any physical abuse by Petitioner; these allegations are less specific and much less corroborated by additional evidence. Indeed, the only references to physical abuse prior to the initiation of these proceedings are statements Respondent allegedly made to the therapist; however, the therapist's contemporaneous notes do not mention physical abuse and her explanation for its absence was not sufficiently persuasive to establish that any such abuse had occurred. And, the evidence is entirely insufficient to find that Petitioner abused the child physically, sexually, or psychologically. Although the therapist testified that the child clearly showed signs of trauma when they first met, the therapist was unable to pinpoint the source of that trauma. Before arriving in New York, the child frequently witnessed her parents argue, fled her home with no warning, ceased contact with her father, her grandmother, and her mother's family with whom she often spent time, and lived for seven months in a shelter that Respondent described as very stressful and unpleasant. Thus, there is reason to believe that, whether in combination or in isolation, the time the child spent at the shelter, as well as being uprooted from her life in the United Kingdom, certainly could have been the cause, or the primary cause, of the trauma that the child was suffering upon her arrival in the United States. The Court therefore agrees with Dr. Fraser's conclusion that based on the record before the Court, it is impossible to determine, by even a preponderance of the evidence, that the child's trauma was caused by anything Petitioner did to the child. *Cf. Reyes Olguin*, 2005 WL 67094, at \*7 (rejecting the petitioner's

41

suggestion that the child's PTSD may have been caused by something other than the abuse, such as separation from his father and the escape to the United States, because the expert "ruled out any other source for the PTSD except for [the petitioner's] violent behavior").

Moreover, the courts that determined that the Article 13(b) exception applied have done so when presented with uncontroverted expert testimony and other credible evidence that the child would face grave risk if returned. For example, in *Blondin*, the only expert testified that a return to France would almost certainly trigger the child's PTSD; the Second Circuit held that "[a] grave risk of psychological harm, even construed narrowly, undoubtedly encompasses an almost certain recurrence of traumatic stress disorder." *Blondin IV*, 238 F.3d at 163 (alterations and internal quotation marks omitted). Here, Dr. Cling testified that removing the child from her stable United States environment could have a "catastrophic effect" and that the child would very likely be at risk for another psychological breakdown. In contrast, Dr. Fraser agreed that the child should not be returned to her father's custody without further investigation (as he believes is true in any case involving abuse allegations), but testified that if the move was properly framed to the child, the child could return to the United Kingdom with her mother for a custody evaluation without suffering trauma or being at grave risk of harm.

The Court therefore agrees with Petitioner that Respondent has failed to carry her burden of establishing by clear and convincing evidence that returning to the United Kingdom would pose a grave risk of harm to the child. There is simply insufficient evidence that merely returning to the United Kingdom – even if that country was the site of some of the child's trauma, whether caused by the child witnessing Petitioner's abuse of Respondent or by being in the shelter – in and of itself would present a grave risk. By all accounts the child is doing quite well now; in fact, she had stopped therapy because it was determined that it was no longer

needed.  Respondent has two sisters in the United Kingdom with whom the child had spent time prior to leaving that country.  In his post-trial memorandum and at the Oral Argument, Petitioner suggested several undertakings that could help ensure the child's safe transition to the United Kingdom.  Petitioner is not suggesting that either the Respondent or the child would live with him in London and he in fact represented that he would not want to have any contact with Respondent outside the courtroom.  Moreover, there is no evidence that Petitioner would not comply with any court orders that would allow for, or require, such arrangements.  Petitioner made use of the United Kingdom's legal system to try and locate the child.  Given the narrowness of this exception, and the presumption of the Hague Convention in favor of returning the child, the Court concludes that there is insufficient evidence to support the application of the grave risk defense in this case.

### 2.  The Settled Defense

The Convention provides that where a period of more than one year has elapsed between the dates of the wrongful removal of the child and "the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is," the judicial or administrative authority "shall [] order the return of the child, unless it is demonstrated that the child is now settled in its new environment."  Hague Convention, art. 12, *reprinted in* 51 Fed. Reg. 10,495, 10,499.  For this defense to apply, Respondent must persuade the Court, by a preponderance of the evidence, that the child should not be returned to the United Kingdom because the child has been in New York for more than one year and has become settled.  *See* 42 U.S.C. § 11603(e)(2)(B).  Article 12 does not define "settled" or state how this defense is to be proved, but the burden falls upon the party opposing the return of the child to establish the defense, while at the same time, preserving the discretionary power of a court to

43

determine whether or not the defense justifies refusing to repatriate the child.  *See Perez-Vera Report*, *supra*, ¶ 109.

"To the extent that Article 12 permits [a] court[] . . . to deny repatriation on this basis, it effectively allows [the court] to reach the underlying custody dispute, a matter which is generally outside the scope of the Convention."  *Blondin IV*, 238 F.3d at 164.  "Although there is nothing magical about one year, its basic purpose is designed to serve the best interests of the child . . . ."  *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997) (footnote omitted).  Thus, although the Convention's aim is to return the child without considering the custody merits, the Convention realized that at some point, a child may become so settled in his or her new country that repatriation might no longer be in the child's best interests.  However, given the Convention's underlying goals, "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."  State Dep't Legal Analysis § III(I)(1)(c), 51 Fed. Reg. at 10,509.  In addition, the Court must also consider evidence concerning the child's contacts with and other ties to her State of habitual residence, in this case the United Kingdom.  *See id.*

In discussing the selection of the one-year period, the Convention's Reporter explained that "the difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard."  *Perez-Vera Report*, *supra*, ¶ 107.  The Convention acknowledged the potential difficulties in establishing a child's whereabouts but concluded that a "single time-limit of one year" was the best option.  *Id.* ¶ 108.  The date is measured based on when proceedings under the

Hague Convention were commenced. *See id.*[16]

### a. Equitable Tolling

In the instant case, the Petition was filed more than a year after the wrongful removal of the child. The child was removed from the United Kingdom in July 2009 and Petitioner did not file his Petition in this Court until November 10, 2010. However, Petitioner asserts that the one-year period should be equitably tolled because Respondent concealed the whereabouts of the child from Petitioner, preventing him from timely filing his Petition. Accordingly, Petitioner maintains that the Article 12 defense is not available to Respondent and that the Court must order the child's return.

Neither the Hague Convention nor ICARA mention equitable tolling, and the Second Circuit has not considered whether the one-year period in Article 12 may be tolled. However, a number of courts outside the Second Circuit have applied equitable tolling, concluding that refusing to toll the one-year period would create incentives for abducting parents to conceal the child's whereabouts until after one year had lapsed and thus reward the behavior the Convention seeks to prevent. *See, e.g.*, *In re B. del C.S.B.*, 559 F.3d 999, 1014 (9th Cir. 2009) ("[A] court may equitably toll the one-year period where . . . (1) the abducting parent concealed the child and (2) that concealment caused the petitioning parent's filing delay."); *Duarte v. Bardales*, 526

---

[16] In his Memorandum of Law, Petitioner also points out that he filed his ICARA application in March 2010, well less than a year after Respondent and the child left the United Kingdom. (Pet'r Mem. 19.) However, the date of the filing of the application is irrelevant; the one-year period is measured from when the Petition was actually filed in this Court. *See Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. 2007) ("The petition must be filed with the court of record, not the Central Authority, to file within the one-year [period]."); *Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (noting that courts "have uniformly held that the filing of a petition in the *courts* 'commences' the judicial proceedings under the Convention," not applying to a Central Authority (emphasis in original)).

F.3d 563, 570 (9th Cir. 2008) (concluding that "applying equitable principles to toll the one-year

filing period in circumstances where the abducting parent hides the child is consistent with the

purpose of the Convention to deter child abduction" because, although there are "serious

concerns with uprooting a child who is well settled regardless of whether the abducting parent

hid the child," giving an affirmative defense to parents for hiding a child would encourage both

child abductions and hiding children from parents seeking return); *Furnes v. Reeves*, 362 F.3d

702, 723 (11th Cir. 2004) ("[E]quitable tolling may apply to ICARA petitions for the return of a

child where the parent removing the child has secreted the child from the parent seeking

return."); *Wasniewski v. Grzelak-Johannsen*, No. 06-CV-2548, 2007 WL 2071957, at *6 (N.D.

Ohio July 13, 2007) (weighing concern for "rewarding an abductor for concealing a child long

enough for the child to become 'well-settled'" against the harm "associated with a 'second

removal,' uprooting the child from the place to which he now has developed ties," and

concluding that "[a]lthough not a statute of limitations, Article 12's proscribed time frame

should not be considered" where a parent absconds with the child "without prior notice or post-

abduction contact"); *Belay v. Getachew*, 272 F. Supp. 2d 553, 563 (D. Md. 2003) (concluding

that although "Article 12 may not be a statute of limitations per se, it should be subject to some

form of equitable tolling" because "where the actions of the abductor in concealing the child

may have abetted the child in forming roots in the new country, [courts] must have the flexibility

to take into account those actions in determining the outcome of the case under Article 12");

*Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1363 (M.D. Fla. 2002) ("If equitable

tolling does not apply to ICARA and the Hague Convention, a parent who abducts and conceals

children for more than one year will be rewarded for the misconduct by creating eligibility for an

46

affirmative defense not otherwise available.").[17]

However, the only court within the Second Circuit to consider this issue determined that equitable tolling does not apply to the Article 12 settled defense.  *See Matovski*, 2007 WL 2600862, at *11.  The *Matovski* court concluded that "the one-year period in Article 12 is not a limitations period, nor is it analogous to a limitations period [because] . . . '[a] petition for return of the child *is not barred if it is filed over one year from the date of removal*.'"  *Id.* at *12 (quoting *Anderson v. Acree*, 250 F. Supp. 2d 872, 875 (S.D. Ohio 2002)) (emphasis in *Matovski*).  Instead, the *Matovski* court concluded that the settled defense "is a recognition that, after the passage of a sufficient period of time, the child's interests in remaining in an established environment may be superior to the interest of the petitioning parent [and thus,] [e]quitable tolling, if accepted, would place the interests of the petitioning parent above those of the potentially settled child simply because the petitioner may have had good reason for failing to file sooner."  *Id.*  Therefore, in the court's view, "[e]quitable tolling would be inconsistent with the Convention's careful balancing of interests" and, therefore, concluded that it does not apply to Article 12.  *Id.*

A few other courts, although far less than the majority, have agreed.  *See, e.g.*, *Anderson*, 250 F. Supp. 2d at 875 ("[T]he drafters of the Hague Convention decided that after the passage of a year, it became a reasonable possibility that the child could be harmed by its removal from

---

[17] Some of these courts have also noted that limitation periods are usually subject to equitable tolling unless tolling would be inconsistent with the text of the relevant statute.  *See, e.g.*, *Duarte*, 526 F.3d at 570 ("'It is hornbook law that limitations periods are customarily subject to equitable tolling unless tolling would be inconsistent with the text of the relevant statute.  Congress must be presumed to draft limitations periods in light of this background principle.'" (quoting *Young v. United States*, 535 U.S. 43, 49-50 (2002))); *Furnes*, 362 F.3d at 723 (same).

an environment into which the child had become settled, and that the court ought to be allowed to consider this factor in making the decision whether to order the child's return.  This potential of harm to the child remains regardless of whether the petitioner has a good reason for failing to file the petition sooner, such as where the respondent has concealed the child's whereabouts."); *Toren v. Toren*, 26 F. Supp. 2d 240, 244 (D. Mass. 1998) ("The language of the Convention is unambiguous, measuring the one-year period from the date of the wrongful retention.  It might have provided that the period should be measured from the date the offended-against party learned or had notice of the wrongful retention, but it does not.  That is not surprising, since the evident import of the provision is not so much to provide a potential plaintiff with a reasonable time to assert any claims, as a statute of limitation does, but rather to put some limit on the uprooting of a settled child." (alteration, citation, and internal quotation marks omitted)), *vacated on other grounds*, 191 F.3d 23 (1st Cir. 1999).

The Court agrees with the conclusion reached in *Matovski*.  The one-year period is not a statute of limitations and, therefore, it is not subject to equitable tolling.  A petitioner is not barred from bringing a petition after the one-year period has lapsed; rather, after that point, a court must consider the countervailing consideration that the child may now be better served remaining where he or she is currently located.  It is clear, from both the wording of Article 12 and the *Perez-Vera Report*, that the purpose of the settled defense is not to give petitioners a reasonable amount of time in which to bring their claims, as is the function of most statutes of limitations.  Instead, the purpose is to take into account that if the child has become settled, its interests have to be weighed.  And the Convention decided that after one year had passed, the child's interests would almost presumptively carry more weight than the interest of a petitioner.

The Court acknowledges that in some respects, this seems to be inconsistent with the

goals of the Convention because, of course, there is a concern that this defense could reward or encourage abducting parents to hide their children from the other parent in such a way, and for a sufficient length of time, that the children are allowed to become settled.  However, presumably the drafters of this exception were aware of that concern and, nevertheless, balanced the competing interests at stake and decided to include a defense providing for the reality that even if a child is wrongfully removed, after a certain amount of time has passed, it could be too harmful to a child to order that he or she be removed once again.  They could have chosen a longer length of time, but, for whatever reason, they decided on one year.

Moreover, the Convention does provide a mechanism to account for the principles underlying the equitable tolling argument – the court's discretion.  As the Second Circuit has explained, "if more than one year has passed, a demonstration that the child is now settled in its new environment may be a *sufficient* ground for refusing to order repatriation."  *Blondin IV*, 238 F.3d at 164 (emphasis in original).  But, a court is not required to return a settled child.  *See Blondin II*, 189 F.3d at 246 n.4 (noting that even if a defense has been established, "the district court is not necessarily bound to allow the child to remain with the abducting parent"); *see also Matovski*, 2007 WL 2600862, at *12 ("Because the denial of a petition pursuant to Article 12 is discretionary, equitable tolling is unnecessary to deter an abductor from concealing the whereabouts of a wrongfully removed or retained child.").  A court may take into consideration efforts by the abducting parent to conceal the child, or by the searching parent to find the child, in determining whether to repatriate the child even though the child was deemed to be settled.  While the Convention and ICARA do not mention equitable tolling, the Department of State, in its public notice explaining the Convention, did state:

The reason for the passage of time, which may have made it possible for the child

49

> to form ties to the new country, is also relevant to the ultimate disposition of the return petition.  If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.

State Dep't Legal Analysis § III(I)(1)(c), 51 Fed. Reg. at 10,509.  The courts that have tolled the one-year period have cited this passage as evidence that equitable tolling should apply to petitions brought under the Convention.  *See, e.g.*, *Duarte*, 526 F.3d at 570.  However, the Court believes that instead of turning the Article 12 one-year period into something that it was not intended to be – a statute of limitations – concealment of a child is simply one factor for the Court to consider in making its ultimate determination.

In any event, even if equitable tolling could apply to Convention petitions, the Court does not believe that tolling would be warranted in this case.  The record makes clear that Petitioner made certain efforts to locate the child using the United Kingdom's legal system.  He was uncertain that the child was in the United States, or had even left the United Kingdom, until well after Respondent and the child were living in New York; although Petitioner suspected that Respondent might come to her sister in New York, he also contemporaneously indicated that Respondent might have taken the child to Colombia.  And, Petitioner testified that he wanted to make absolutely sure that the child was not in the United Kingdom before bringing this Petition.

Yet, it remains the case that Respondent took the child to her sister Maria in New York, the same sister that Respondent had visited immediately before leaving Petitioner in November 2008.  At the Evidentiary Hearing, Petitioner testified that when Respondent took that trip to

New York, she gave him the phone number and address of where she would be staying.[18]
Petitioner emphasizes that he did not call Maria because he was following the legal advice of his
solicitors not to contact Respondent or her family and that Respondent's family in London had
told him to stay away if he did not want trouble.  While Petitioner's attempts to follow the proper
legal channels are laudable, there is no reason why his solicitors could not have contacted Maria
in New York to see if Respondent and the child were there, as they contacted Respondent's
family in London.  Petitioner had reason to believe that this very location might be one of the
places to which Respondent would bring the child and had contact information; accordingly, his
failure to file the Petition until November 2010 is not excused.

At the Oral Argument, Petitioner's counsel proposed February 22, 2010, as the date that
Petitioner knew that the child was probably in New York.  (Oral Arg. Tr. 11.)  In his
Memorandum of Law, Petitioner also asserts that he could not file his Petition until November
2010 because he was unable to obtain legal counsel in the United States until that time.  (Pet'r
Mem. 19.)  The Court recognizes that Petitioner's difficulty in obtaining counsel to submit his
Petition is unfortunate and might explain part of the delay, but reiterates that the purpose of the
Article 12 exception is not to serve as a limitation period; instead, the exception focuses on the
importance of the interest of the child who is now settled in the new environment.  Therefore,
although the delay in filing the Petition may not be entirely Petitioner's fault, the Court cannot
conclude that his efforts to locate the child and bring the Petition within the one-year period
outweigh the interests of the child, if the child is deemed to be settled in New York.

---

[18] As previously noted, in the disclosure applications Petitioner submitted in the United
Kingdom, he indicated that he only had the sister's phone number in New York, and not her
address.  Regardless, he did have some contact information for the sister in New York.

Moreover, although Respondent did not tell Petitioner where she and the child were –
and admittedly did not want him to find them – she also did not conceal the child to an extent
that would warrant equitable tolling, if it was available.  In this case, unlike many of the cases
where equitable tolling was applied, Respondent did not go to a place that Petitioner could not
have imagined she would go, nor did she move the child from one location to another or take
other steps to remain hidden.  *Cf. Mendez Lynch*, 220 F. Supp. 2d at 1363.  Instead, Respondent
took the child to New York to live with the same sister that Respondent had visited in November
2008, right before leaving Petitioner.  Upon arriving in New York, Respondent enrolled the child
in school, did not change either her or the child's names, and has stayed in the same place.  Thus,
Respondent simply has not engaged in egregious conduct to ensure that Petitioner could not find
the child.[19]

### b.  The Merits of the Settled Defense

Therefore, because the child had been in New York for approximately sixteen months at
the time the Petition was filed, the Court must consider whether the child has become settled in
her new environment.  To establish the merits of this exception, Respondent "must show by a
preponderance of the evidence that the child is in fact settled in or connected to the new
environment so that, at least inferentially, return would be disruptive with likely harmful
effects."  *Koc*, 181 F. Supp. 2d at 152 (internal quotation marks omitted); *see also Matovski*,
2007 WL 2600862, at *13 ("Respondent must marshal substantial evidence of the child's

---

[19] There is evidence in the record, particularly in the therapist's notes from Respondent's
early sessions, that Respondent was concerned that Petitioner would find out where she and the
child were living and considered hiding.  (PX3 at R0066, R0068-R0070, R0077.)  But, she did
not; she stayed living with the very sister that she knew that Petitioner knew she had previously
visited and could have gone to stay with when she left the United Kingdom.

significant connections to New York." (internal quotation marks omitted)).  Among the factors
that courts have considered in determining whether or not a child has become settled are:  "the
age of the child[;] the stability of the child's residence in the new environment[;] whether the
child attends school or day care consistently[;] whether the child attends church [or other
religious institutions] regularly[;] the stability of the mother's employment[;] and whether the
child has friends and relatives in the new area."  *Koc* 181 F. Supp. 2d at 152; *see also Matovski*,
2007 WL 2600862, at *13 (same); *Reyes Olguin*, 2005 WL 67094, at *8 (same).

         Here, a number of these factors support a finding that the child is now settled, and there
are some that do not.  As Petitioner pointed out during the Oral Argument, most of the evidence
on this issue came from Respondent herself and, to a lesser extent, from the therapist and from
the child's school records that were submitted into evidence.  However, Respondent is correct
that much of the evidence of the child's connections to her new environment is undisputed.  It is
true that Petitioner himself is not in a position to contradict the evidence, as he has not seen or
spoken to the child since she moved to New York, but the Court does not believe there is any
reason to doubt its veracity.

         At the time Petitioner initiated this action, by all indications, the child had been living in
one place for sixteen months, which is a long period of time in the life of a five-year-old.  Since
they arrived in New York, Respondent and the child have lived in the same location with
Respondent's sister, the sister's partner, Respondent's niece, and the niece's daughter; the child
has become close to this family, and also sees other extended family who live nearby on the
weekends.  Her school records show that she was enrolled in pre-kindergarten last year, and
currently attends kindergarten at the same school.  The child's pre-kindergarten report cards state
that she was progressing socially and academically.  Petitioner points out that the child missed

fourteen days of school in her first semester, but young children can often get sick and miss a lot

of school; the absences do not lead to a conclusion that the child is not settled.  Respondent

testified that the child has made friends at school with whom she sometimes plays after school

and meets at the park or library, goes to ballet class, and attends church.  Both experts testified

that Respondent appropriately cares for the child, and the child told Dr. Fraser that she loves

where she lives and is happy here in New York.  The therapist also testified that the child has

improved dramatically since she began seeing her and seems to be doing very well here in her

current environment.[20]

However, Respondent is unemployed and she and the child are entirely dependent on

Respondent's sister Maria and Maria's partner for financial support.  In *Matovski*, the court

concluded, in similar circumstances to here, that the mother's inconsistent employment history

was not a major factor because the children and mother were financially supported by the

children's grandparents, with whom the children and mother lived, rendering their overall

financial stability "reasonably assured."  *Matovski*, 2007 WL 2600862, at *14 (determining that

overall, there was "substantial, persuasive evidence" that the children had significant

connections to their new environment because they had lived in the same home since arriving in

New York, consistently attended school and activities with the same classmates, socialized and

played with many friends, and were attached to their large extended family in New York).  In

contrast, in *Koc*, the court viewed the mother and child's financial dependence on the mother's

parents as a negative factor, *see Koc*, 181 F. Supp. 2d at 154, but there they also received support

---

[20] Petitioner argues that the child's current residence is not stable because of potential
drug issues (Pet'r Mem. 20); however, as noted *supra*, the Court finds there is no evidence
indicating that anyone living in the house, or anyone the child is in contact with, currently has a
drug problem.

from public services, *see id.*, and had only lived with the child's grandparents for the first three months of the twenty-seven months that they had been living in New York prior to the filing of the petition, *see id.* at 140-41.  Under the circumstances presented in the instant case, the Court finds that there is nothing to suggest that the financial and other support that the child and Respondent are receiving from Maria's family is in jeopardy, or is unlikely to continue for the foreseeable future.

At the Oral Argument, Petitioner, while acknowledging that a five-year-old can be well settled, argued that it is harder for a young child to build the same types of connections as an older child and asserted that Respondent had not presented enough evidence of connections. While the child is only five years old, she is old enough to form attachments, but also young enough that her involvement in extracurricular and community activities is somewhat limited. However, there is uncontroverted testimony that the child has made friends and is engaged in some activities.  Indeed, a number of courts have found that children of similar ages to the child here were settled in very similar factual circumstances.  *See Edoho v. Edoho*, No. 10-CV-1881, 2010 WL 3257480, at *6 (S.D. Tex. Aug. 17, 2010) (concluding that four- and six-year-old children were settled where they had lived in Houston for almost two years, had significant contact with extended family who lived close by, participated in activities, attended church and Sunday school, and the older child was enrolled in school, even though respondent was unemployed but looking for employment); *Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. 2007) (determining that three-year-old child was settled where she was performing at two to three age levels above her own, was well-liked and had a core group of friends, often attended community cultural events, and had many relatives in the region); *Zuker v. Andrews*, 2 F. Supp. 2d 134, 141 (D. Mass. 1998) (explaining that four-year-old child was settled because

he had attended the same daycare center for over a year even though he had moved once, the center's director said that the child had thrived academically and socially, he had relationships with teachers and children, attended birthday parties and play dates at his home and friends' homes, saw his grandmother often, and no contrary evidence was introduced); *Robinson*, 983 F. Supp. at 1346 (finding that there was significant, undisputed evidence that children ages five and ten were settled in their new environment where they had lived in the same area for twenty-two months, had relationships with the respondent's extended family, were doing well in school and had made friends, and were involved in extracurricular activities).

There is also some concern as to the immigration status of Respondent and the child. They have both overstayed their visas and thus are not legally in the United States.  In *Koc*, the court, in determining that the child was not settled, took into account that she and her mother had overstayed their visas and were in the country illegally, which the court noted would make it virtually impossible for the child to see her father if she remained in the country.  *See Koc*, 181 F. Supp. 2d at 154.  However, the Ninth Circuit has rejected the idea that immigration status should render an otherwise settled child not settled, concluding that immigration status should only be a significant factor in the settled analysis if there is an immediate, concrete threat of deportation.  *See B. del C.S.B.*, 559 F.3d at 1010-14.  Here, there is no indication that Respondent and the child face an imminent, or any, threat of deportation, and there is unrefuted testimony from Respondent that she is looking into methods to gain legal status, including having her sister Maria, who is a United States citizen, sponsor Respondent and the child for citizenship.  There is nothing to suggest that, at this moment, or in the near future, the immigration status of the child and Respondent is likely to upset the stability of the child's life here in New York.

It is true that the child's life is not perfect.  Although the child has, by all accounts, vastly improved through therapy, she still has some struggles, including a recurrence of wetting herself and having tantrums.  The therapist's notes indicate that in the fall of 2010, the child had difficulties regarding her mother's new boyfriend (PX3 at R0122), although no mention was made of this relationship at the Evidentiary Hearing.  The child also apparently had two issues at school where she claimed a teacher and another student had kissed and inappropriately touched her; following these incidents, Respondent was unhappy with the school's response.

However, the child's life does not have to perfect for her to be settled.  Viewing the totality of the circumstances, the description of the child's life, as presented to the Court, suggests stability in her family, educational, social, and most importantly, home life.  Courts that have found that a child was not settled have tended to do so in cases where, unlike here, a child has moved frequently and therefore not had a stable living situation.  *See, e.g.*, *Lutman v. Lutman*, No. 10-CV-1504, 2010 WL 3398985, at *5-6 (M.D. Pa. Aug. 26, 2010) (declining to find that nine-year-old child was settled despite evidence that he was doing well in school because the child had resided in three different locations and attended three different schools in the two years since he was wrongfully retained, had far more family in Israel than in the United States, had a limited network of friends, did not engage in extracurricular or community activities, and the respondent father had been with his current employer for only fifteen months and had a history of financial and employment instability); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1282-83 (N.D. Ga. 2004) (ten-year-old child who had lived in the United States for two-and-a-half years was not well settled despite regularly attending and performing well in school, participating in extracurricular activities, and having friends because, since arriving, she had moved three times, attended three different schools, had almost no family in the United

States, and was here illegally); *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1313-15 (S.D. Fla. 2004) (nine-year-old child was not settled even though she had lived in the United States for two-and-a-half years, consistently attended and performed well in school, played soccer, and had friends, because she had changed residences five times and schools once, had only her mother and her aunt in the United States, could be deported, and was subject to her mother's uncertain immigration status and employment prospects); *Koc*, 181 F. Supp. 2d at 153-55 (finding that eight-year-old child was not settled because she had lived in three locations and attended three different schools in the two-and-a-half years she had been in the United States, did not regularly participate in extracurricular school or religious activities, did not socialize with school friends outside of class or have friends in the neighborhood, had many friends and family back in Poland, and had uncertain immigration status and financial support, although she was doing well in school and saw some family in the area).

After considering all of these factors, the Court concludes that the preponderance of the evidence demonstrates that the child is settled in her current environment. To uproot her once again would be extremely disruptive; she has reached the "point at which [she has] become so settled in [her] new environment that repatriation [is] not . . . in [her] best interest." *Blondin IV*, 238 F.3d at 164. Accordingly, the Court finds that the elements of the Article 12 defense have been met.

### D.  Discretion

As already noted, a finding that the child is settled does not end the analysis. The Court must consider whether to exercise its discretion and repatriate the child even though she is now settled in New York. Thus, the Court has considered the points discussed earlier regarding the efforts of Petitioner to locate the child, the fact that Respondent – regardless of whether she hid

the child – did abscond with the child and leave the United Kingdom in violation of Petitioner's parental rights, and Petitioner's compelling interest in having his child returned to the United Kingdom.  But the Court is persuaded that it should not exercise its discretion in this case to return the child.  As explained above, there is strong evidence that the child is quite settled in New York.  Although Petitioner was fairly diligent in searching for her, his efforts do not outweigh the child's interest in remaining in her current, stable environment.  Nor does Respondent's conduct, although clearly inconsistent with the Convention, justify such an exercise of discretion in this case.

In reaching this conclusion, the Court has also considered the specific impact of returning to the United Kingdom on this particular child.  By all accounts the child is much improved since arriving in the United States, but she clearly is more vulnerable than an average five-year-old who has never experienced trauma – regardless of the source of the trauma.  Even though the Court has concluded that the child would not be at a grave risk of harm if returned, the expert testimony did indicate that such a move, at this time, would be difficult for the child.  This particular child does seem, in the Court's view, to be more fragile than other children, and ordering that she be forced to leave her present stable environment, where she is currently doing well, and returned to the United Kingdom for a custody proceeding would not be appropriate at this time.  Such an uprooting potentially would be traumatic enough that, in the exercise of discretion, it outweighs Petitioner's arguments regarding the equities.

Furthermore, the Court reiterates that its decision to deny the Petition is not a custody determination; nor does it mean that Petitioner should not have contact with the child or that Respondent can keep the child away from Petitioner.  *See Muhlenkamp*, 521 F. Supp. 2d at 1153 ("The district court cases that have found in favor of the respondent clearly demonstrate that a

59

temporary order on custody should not be issued."); *Wojcik v. Wojcik*, 959 F. Supp. 2d 413, 421 (E.D. Mich. 1997) ("The Court's decision [to deny the petition because the child is settled] is not a decision on who should have custody of the children, or where the children should ultimately live, or even that the children are settled in the United States for the purposes of determining custody.").  Instead, this ruling is merely a decision that the custody determination should be made by a court in New York, as opposed to one in the United Kingdom.  *See Matovski*, 2007 WL 2600862, at *15 (declining to exercise discretion to grant petition where the Article 12 defense was established, because the courts of the United States and Australia were both competent to consider issues of custody and visitation, travel to Australia for a custody determination would disrupt the children's schooling, social relationships, and routines, and the father could participate in a New York state court case as he had done in the Hague Convention petition case; therefore, it was "more sensible that any judicial proceedings over custody and visitation occur where the children ar[e] now settled").  Accordingly, the child should not be returned to the United Kingdom at this time and the custody arrangement of the child should be determined by a New York court.[21]

### III.  Conclusion

For the reasons stated herein, Petitioner has established a prima facie case of wrongful

---

[21] The Court acknowledges that this outcome is in many ways unfair to Petitioner, who has been denied access to his child for over two years now.  And the Court recognizes that because neither Petitioner nor Respondent appears to have the finances or immigration status to be able to travel easily between the United Kingdom and New York for a custody hearing, this outcome does disadvantage Petitioner (and his opportunities to have a meaningful relationship with his child).  But the Convention provides for the settled defense, the merits of which the Court has determined have been established here.  And, in the end, given that she is now settled in New York, the Court believes the child is simply too fragile to justify forcing her to return to the United Kingdom at this time.

removal under the Hague Convention. Respondent has failed to establish that sending the child

back to the United Kingdom for a custody determination would expose the child to a grave risk

of harm or place her in an intolerable situation. However, Respondent has demonstrated that at

the time the Petition was filed, the child had been in New York for more than a year and has

become settled in her new environment. Lastly, the Court chooses not to exercise its discretion

to order the child returned even though she is now settled. Accordingly, the Petition is denied.[22]


SO ORDERED.

Dated:      White Plains, New York
           August 22, 2011

                    KENNETH M. KARAS
                    UNITED STATES DISTRICT JUDGE

---

[22] Because the Court is denying the Petition, Petitioner's request for an order directing
Respondent to pay Petitioner's legal costs and fees is also denied.

Service List (via ECF)

Sharon M. Mills, Esq.
Amos W. Barclay, Esq.
John R. Hein, Esq.
Shawn P. Regan, Esq.
Hunton & Williams, LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
(212) 309-1000
Fax: (212) 309-1100
smills@hunton.com
abarclay@hunton.com
jhein@hunton.com
sregan@hunton.com
*Counsel for Petitioner*

Rachel G. Skaistis, Esq.
Lauren A. Moskowitz, Esq.
Etienne Barg-Townsend, Esq.
Carrie R. Bierman, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
Fax: (212) 474-3700
rskaistis@cravath.com
lmoskowitz@cravath.com
etownsend@cravath.com
cbierman@cravath.com
*Counsel for Respondent*