

HUNTON & WILLIAMS LLP
200 PARK AVENUE
NEW YORK, NY 10166-0005

TEL   212 • 309 • 1000
FAX   212 • 309 • 1100

SHARON M. MILLS
DIRECT DIAL: 212 • 309 • 1226
EMAIL: smills@hunton.com

February 2, 2011

FILE NO: 99997.031681

**BY ELECTRONIC MAIL (with permission)**

Honorable Kenneth M. Karas, U.S.D.J.
United States District Court Southern District of New York
United States Courthouse
300 Quarropas Street, Room 533
White Plains, New York 10601-4150

   Re: **Manuel Jose Lozano v. Diana Lucia Montoya Alvarez, No. 10-Civ-08485**

Dear Judge Karas:

  Petitioner respectfully submits this letter brief in opposition to Respondent's motion *in limine* to strike portions of the report of Dr. Michael Fraser and to exclude portions of his testimony at trial.

  First, Dr. Fraser's expert report does not "purport[] to explain the law to the [fact finder]," (Motion at 2), and there is no merit to Respondent's assertion that he opined on the meaning of the law. *See e.g., United States v. Fogg*, 652 F.2d 551, 556-57 (5th Cir. 1981), cert. denied 456 U.S. 905, 102 S.Ct. 1751 (1982) (expert testimony proper where expert "merely stated his opinion as [an expert], and did not attempt to assume the role of the court" particularly where expert "never couched his testimony as judicial instructions" and "simply stated his opinion" as an expert); *United States v. Oles*, 994 F.2d 1519, 1522-23 (10th Cir.1993) (expert testimony that defendant's actions constituted 'check kiting' properly admitted where witness "neither attempted to legally define check kiting nor explained the elements of a check kiting offense."). Here, Dr. Fraser merely provided his opinion as an expert as to the fact issue of whether the child would be subject to a grave risk of psychological harm if returned to England. Dr. Fraser did not explain the legal elements of a "grave risk" or attempt to legally define the term. Dr. Fraser's testimony is not inadmissible on this ground.

  Second, Dr. Fraser's testimony and report, based in part on the Minnesota Multiphasic Personality Inventory – Second Edition (the "MMPI-2"), in combination with the interview with the Respondent and the child, as well as his review of supplemental information (Fraser Report at 1), is essential to explain to the court the medical conclusions drawn from the test—an issue clearly beyond the ken of a layperson. *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (expert testimony is "helpful in comprehending and deciding issues beyond the understanding of a layperson."). Dr. Fraser explained that the MMPI-2 is a "highly reliable test that contains scales that provide information not only about a person's psychiatric and emotional symptomology, but it provides valuable information regarding a person's test-taking attitude and

February 2, 2011
Page 2

approach." (Fraser Report at 3). Dr. Fraser explained that Respondent's "approach to the MMPI-2 suggests that she was highly guarded," that she "made unrealistic claims of personal virtue," and she was "generally unwilling to admit faults . . . ." (Fraser Report at 3). Interpreting Respondent's approach, Dr. Fraser stated that Respondent's "defensiveness made it difficult to interpret her clinical scores," concluding that the results of this clinical profile "are of limited utility because [Respondent] likely underestimated the degree of her psychological maladjustment in favor of presenting a positive image of herself on this test." (Fraser Report at 3). Dr. Fraser stated that Respondent's "profile suggests she does not show any signs of psychiatric symptoms that would be associated with post-traumatic stress disorder," and that "[a]lthough her reported symptoms of depression and anxiety on the MMPI-2 fell at the normal level, due to her defensiveness and tendency to deny symptoms, this is likely an underestimation of her emotional functioning." (Fraser Report at 3.).

Dr. Fraser also based his report in part on the Trauma Symptom Checklist for Young Children (the "TSCYC"). Dr. Fraser explained that the TSCYC is a "90-item standardized parent/caretaker-report test for trauma symptoms in children ages 3 to 12 years." (Fraser Report at 4). The test "contains several scales that measure symptoms commonly found in children who have experienced various types of trauma, such as anxiety, depression, anger/aggression, intrusion, avoidance, dissociation, and sexual concerns." (Fraser Report at 4). Dr. Fraser explained that the table generated from the TSCYC showed that, according to Respondent's report of the child's symptoms, the child "continues to show (*during the past month*) heightened signs of post-traumatic stress reactions in many areas, especially involving anxiety, depression, intrusive thoughts about the trauma, avoidance of trauma-related issues, and sexual concerns." (Fraser Report at 5) (emphasis added).

Dr. Fraser emphasized the discrepancy between the reports of Dr. Cling and the child's therapist, his own observations, and the Respondent's report of the child's recent symptoms. *Id.* During Dr. Fraser's interview of Respondent, she made no mention whatsoever that the child had been experiencing symptoms of depression or anxiety, or, most importantly, that she had any sexual concerns about the child. *Id.* Dr. Fraser underscored this analysis: "I have been working with children and adolescents for over 17 years, and in my clinical experience, most parents will mention these symptoms if they are present at the time I meet with them—especially if a parent reports them at such a high level (e.g. 99[th] percentile) as [Respondent] did with [the child]." (Fraser Report at 5). Moreover, Dr. Fraser observed that "although [Respondent] reported that [the child] used to touch her (i.e. the mother's) private parts after disclosing that her father touched her own private area, she did not mention this symptom as a recurring issue that was still being addressed in therapy" but "when responding to the TSCYC items *"pretending to have sex,"* "talking about sex," and "worrying about sexual things," [Respondent] indicated that [the child] does these things "**often**."" (Fraser Report at 5) (emphasis in original). And Dr. Cling's report does not indicate that she observed the child exhibit any such behaviors either. Dr. Fraser concluded that it was "difficult to offer a clear diagnosis due to the differences in information obtained from [Respondent]" during the evaluation. *Id.*

Comprehending these tests is clearly beyond the understanding of a layperson. Dr. Fraser's interpretations and conclusions, drawn from the tests and evaluations of Respondent and the child, combined with his 17 years of clinical experience in this area, are clearly helpful to the Court's determination here, warranting admission of his report and testimony.

February 2, 2011
Page 3

Third, Respondent's assertion that Dr. Fraser "impermissibly opines that Respondent's story is not credible," is a distortion of the law and easily dismissed. The rule of law, as provided in a case cited by Respondent, is that "determining the weight and credibility of [a witness's] testimony. . . . belongs to the [fact finder]." *Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005). Of course, here Dr. Fraser is not opining on Respondent's in-court testimony. Significantly, Dr. Fraser's opinion took into account the reliability of the MMPI-2 test scores, which, as he described in his report, purposefully reveal "information regarding a person's test-taking attitude and approach." (Fraser Report at 3). Dr. Fraser's assessment of Respondent's test-taking attitude and approach was necessary to Dr. Fraser's opinion as to whether there is a strong likelihood that the child will suffer psychological harm if returned to England. Moreover, Respondent's challenge to Dr. Fraser's report on this ground is puzzling given that the report of Respondent's own expert opines on Ms. Montoya Alvarez's credibility. (*See* Report of Dr. B. J. Cling at 2 ("[Ms. Montoya Alvarez's] report seemed to be very reliable.")

Fourth, other courts have found admissible opinions like Dr. Fraser's regarding the MMPI-2. *See* FED.R.EVID. 702; *see also, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (admitting expert evidence that is both reliable and relevant); *Shea v. Long Island R. Co.*, No. 05-Civ-9768, 2009 WL 1424115 at *3 (S.D.N.Y. May 21, 2009) (admitting opinions based on the MMPI-2 that were "relevant and (1) presented by a qualified expert, (2) based upon sufficient facts or data, and (3) the product of reliable principles and methods"). Respondents do not cite to any cases in which a court found an expert's testimony regarding an MMPI test inadmissible.

Fifth, Respondent's complaints about the manner in which Dr. Fraser admitted the MMPI-2 and TSCYC are without merit. As he will testify, Dr. Fraser first administered the English version of Trauma Symptom Checklist for Young Children to Respondent, which Respondent had no difficulty comprehending or completing. Indeed, as Dr. Fraser stated in his report, Respondent "was able to communicate effectively in both English and Spanish (this evaluator is bilingual English/Spanish)." Based on her ability to complete the English version of the Trauma Symptom Checklist and on his observation of Ms. Montoya Alvarez's proficiency with English, Dr. Fraser administered the English version of the MMPI-2 to Ms. Montoya Alvarez. Respondent has not made any showing that Ms. Montoya Alvarez was incapable of comprehending the English version of either test she was administered, and the fact that she is a native Spanish speaker should not invalidate Dr. Fraser's professional decision regarding which test versions to administer, especially since she has lived in English-speaking countries for almost twenty years.

Moreover, the statement in Respondent's motion that Dr. Fraser relied "solely" on the MMPI-2 is simply false. (Motion at 4). As is abundantly clear from the first page of Dr. Fraser's report, he conducted a thorough psychological evaluation, consisting of a clinical interview with the Respondent, a clinical interview with the child, the MMPI-2, and the TSCYC. (Fraser Report at 1). Dr. Fraser listed the supplemental information he relied upon, including legal documentation and exhibits specific to the Hague Convention as well as the Emergency Petition, the March 23, 2010 letter from Clair Joslin, International Child Abduction and Contact Unit (ICACU), Petitioner's March 15, 2010 Central Authority for England and Wales Application Form, documentation related to the Petition in this case, Respondent's January 7,

February 2, 2011
Page 4

2011 Memorandum of Law in Opposition to Petition for Return of Child to Petitioner, and the January 5, 2011 report of Dr. B.J. Cling. (Fraser Report at 1). Dr. Fraser's assessment of the MMPI-2 and TSCYC test results, together with his personal observations of Respondent and the child, was entirely proper. *See Shea*, 2009 WL 1424115 at *3 (expert psychologist properly interpreted MMPI-2 results in conjunction with that patient's medical records from his treating psychologist, the examination of the plaintiff's psychologist, and a clinical interview he conducted with the plaintiff, in accordance with a treatise on MMPI-2 interpretation).

Finally, as is demonstrated by his C.V., and will be elaborated upon in his testimony, Dr. Fraser is qualified to administer and interpret the MMPI-2. Dr. Fraser is a NYS Licensed Clinical Psychologist and is currently the Director of the Psychology Internship Training Program at the Cornell Weill Medical College-Lincoln Medical and Mental Health Center in Bronx, NY. (Fraser C.V. at 1). His responsibilities at the Cornell Weill Medical College include instructing weekly seminars and colloquia to psychology interns and psychiatry residents on, among other things, Forensic Assessment and Neuropsychological Testing. *Id.* Since 2005, Dr. Fraser has served as Director of Forensic Services at Behavioral Associates in Manhattan, where he conducts a wide range of psychological and forensic evaluations involving criminal, civil and child custody matters in both English and Spanish. Dr. Fraser has also presented on "Current Trends in Psychological Testing." (Fraser C.V. at 4). As Dr. Fraser will testify, he administers the MMPI-2 approximately 50 times a year, and he even teaches a course on the test. As such, Dr. Fraser is more than qualified to administer and interpret the MMPI-2, and his report and testimony regarding the Respondent's results on the test should therefore be admitted.

For the foregoing reasons, Respondent's *motion in limine* should be denied.

Respectfully submitted,

Sharon M. Mills

cc:   BY ELECTRONIC MAIL
      Lauren Moskowitz (LMoskowitz@cravath.com)
      Carrie Bierman (CBierman@cravath.com)
      Etienne Townsend (EBarg-Townsend@cravath.com)

99997.031681 EMF_US 34294511v5